Mark L. Esposito
Andrew Hanson
Penn, Stuart & Eskridge, P.C.
804 Anderson Street
Bristol, TN 37620
(423) 793-4812
Email: mesposito@pennstuart.com
Email: ahanson@pennstuart.com

-and-

Jonathan L. Gold (*pro hac vice motion* pending)
LeClairRyan, A Professional Corporation
225 Reinekers Lane, Suite 700
Alexandria, Virginia 22314
(703) 684-8007
Email: jonathan.gold@leclairryan.com

*Counsel for Empire Petroleum Holdings, LLC*

# IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| APPALACHIAN OIL COMPANY, INC., ) | Case No. 2:09-50259 |
| ) | |
| Debtor. ) | |

## LIMITED RESPONSE TO DEBTOR'S MOTION TO: (1) SELL PROPERTY AND ASSUME AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED LEASES FREE AND CLEAR OF LIENS AND ENCUMBRANCES; (2) AMEND SALE PROCEDURES; AND (3) AUTHORIZE DEBTOR TO ENTER INTO MANAGEMENT AGREEMENT

Empire Petroleum Holdings, LLC ("Empire"), a party in interest, by counsel hereby files this Limited Response to the Debtor's Motion to: (1) Sell Property and Assume and Assign Executory Contracts and Unexpired Leases Free and Clear of Liens and Encumbrances; (2)

Amend Sale Procedures; and (3) Authorize Debtor to Enter into Management Agreement ("Sale Motion") filed by the Debtors on August 25, 2009 (Docket No. 635), and support thereof, states as follows:

1. Empire is an oil distribution company, whose principal place is business is located in Rockville, Maryland.

2. As stated in the Sale Motion, Empire submitted the high "bulk bid" of $9.1 million to purchase substantially all of the assets of the Debtor, assume certain executory contracts and unexpired leases, and purchase the value of the Debtor's inventory as of the closing date. As stated in his Affidavit Supporting the Motion to Shorten Time filed on August 25, 2009 (Docket No. 636-1) (the "Affidavit"), P.A. Weber, III stated that Empire was one of only two "bulk bidders" to submit a bid. Of the two bids, only Empire's bid was a "workable" bid.

3. A Purchase and Sale Agreement between Empire and the Debtors was entered into on or about July 24, 2009, which provided Empire with, among other rights, a due diligence period of fifteen (15) business days and certain termination rights related thereto (the "Empire Purchase Agreement").

4. Upon concluding its due diligence, Empire determined that the bid of $9.1 million was inappropriate. Shortly thereafter, on or about August 13, 2009, in accordance with the Empire Purchase Agreement, Empire issued a termination letter to the Debtor.

5. In order to entice Empire to place a new bid, while at the same time preserving the right to seek other competing bids, if any, the Debtor offered, among other concessions, to provide a break-up fee to Empire.

6. Based upon the terms referenced in the Amendment (as defined below), which included the Break-Up Fee (as defined below), on August 14, 2009, Empire made a new offer of $5.5 million.

7. On August 21, 2009, the parties signed an amendment to the Empire Purchase Agreement (the "Amendment"), which, among other things, reduced the purchase price to $5.5 million; permitted the Debtor to secure competing offers at least five percent (5%) greater than the $5.5 million offer with an option for Empire to submit a bid that was $100,000.00 better than the competing offer, and if that were unsuccessful, providing Empire with a break-up fee of five percent (5%) of its $5.5 million purchase price offer, subject to court approval (the "Break-Up Fee").

8. Significantly, pursuant to the Amendment, the Debtor is obligated to prepare and file any and all papers required to obtain approval of the Break-Up Fee from this Court.

9. As stated by Mr. Weber in the Affidavit, on August 21, 2009, the Debtor signed a term sheet with Florida Sunshine Investments I, Inc. ("Sunshine") for purchase of substantially all of the Debtor's assets for the sum of $6.25 million plus the value of the inventory.

10. As further stated by Mr. Weber in the Affidavit, Sunshine did not contact the Debtor until August 18, 2009, well beyond the previously established and approved bidding process and Sale Procedures.

11. In the Sale Motion, the Debtor states that Empire is not prejudiced by the sale to Sunshine, because, among other things, of "the ability of Empire to increase its bid and the availability of a break-up fee."

## RELIEF REQUESTED

12. Empire requests that the Sale Motion be denied, to the extent it does not provide for the Break-Up Fee to be awarded to Empire.

13. Empire requests that the Break-Up Fee be approved as an administrative expense pursuant to 11 U.S.C. § 503.

## LEGAL ANALYSIS

14. Approval of break-up fees and other forms of bidding protections in connection with the sale of a debtor's property pursuant to section 363 of the Bankruptcy Code is an established practice in chapter 11 cases. *See, e.g., Gey Assocs. v. 310 Assocs. (In re 310 Assocs.)*, 346 F.3d 31, 33-34 (2d Cir. 2003). Sellers of assets often employ break-up fees in order to encourage an active bidding process. Indeed, it is relatively well settled that break-up fees are "important tools to encourage bidding and to maximize the value of the debtor's assets." *The Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

15. The business judgment rule governs the evaluation of a debtor's decision to offer a break-up fee. *See In re Integrated Resources, Inc.*, 147 B.R. at 660; *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989). Break-up fees for purchasers of a chapter 11 debtor and/or its assets constitute appropriate compensation for the risk involved in preparing and proposing a bid, which thereby enhances the value of a debtor's estate by attracting initial bids and establishing a minimum standard for competing bids or otherwise benefits the estate. *In re Integrated Resources, Inc.*, 147 BR. at 658 ("A bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's length negotiations."); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990) (decision to enter

into agreement including a break-up fee amply justified by need to prevent a prospective bidder from withdrawing from transaction).

16. Break-up fees take many different forms, including paying the out-of-pocket expenses incurred by a bidder in arranging the deal, reimbursing due diligence expenses, or compensating a bidder for its lost opportunity costs. *In re Hupp Indus, Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992). Outside the bankruptcy context, courts commonly approve break-up fees. Such fees are presumptively appropriate under the business judgment rule, and non-bankruptcy courts rarely rule on their propriety. *See, e.g., Cottle v. Storer Communication, Inc.*, 849 F.2d 570 (11th Cir. 1988); *CRTF Corp. v. Federated Dep't Stores*, 683 F. Supp. 422, 440 (S.D.N.Y. 1988); *Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614 (S.D.N.Y. 1987).

17. Given that break-up fees generally benefit the bankruptcy estate, they are usually afforded priority as an administrative expense claim. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999). Indeed, the *O'Brien* Court identified at least two instances in which bidding incentives may provide benefit to the bankruptcy estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, when the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.* at 537.

18. Empire was one of only two bulk bidders who complied with the previously approved Sale Procedures. Of those two bidders, Empire's bid was the only workable bid made for the Debtor's assets.

19. Since its initial bid, Empire has expended significant efforts to negotiate sale terms and conduct due diligence on an expedited basis. Because of those efforts, Empire was able to more accurately value the Debtor's assets, and ultimately determined that the initial bid was inappropriate.

20. The Break-Up Fee provision enticed Empire to place a new bid. Following completion of its due diligence, Empire was able to ascertain that a purchase price for the assets in the amount of $5.5 million was more reasonable and appropriate. But for the Break-Up Fee, Empire would not have agreed to submit a new bid under the terms referenced in the Amendment.

21. The amount of the Break-Up Fee is fair and reasonable, especially given the significant efforts expended, and costs incurred, by Empire during the sale process.

22. Moreover, Empire's bid of $5.5 million enabled the Debtor to establish a floor to solicit competing bids, and, thus, allowed the Debtor to insist on a competing bid that was materially higher or otherwise better than Empire's bid.

23. Empire's efforts to negotiate a purchase price and conduct the necessary due diligence were therefore highly critical in establishing and preserving the value of the Debtor's assets, and were, no doubt, instrumental in the Debtor receiving Sunshine's bid in the amount of $6.25 million.

24. Through Empire's efforts, the Debtor and the bankruptcy estate will now receive a substantially higher sale price, which will benefit the estate and its creditors.

WHEREFORE, based on the foregoing, Empire requests this Court enter an order (1) denying the Motion to Approve Sale to the extent it does not allow for Empire to receive a break-up fee; (2) approving a break-up fee in the amount of five percent (5%) of the $5.5 million bid made by Empire; (3) allowing for payment of the break-up fee as an administrative expense under 11 U.S.C. § 503(b)(1); and (4) provide such additional and further relief as the Court deems proper.

EMPIRE PETROLEUM HOLDINGS, LLC,

/s/ Mark L. Esposito
Counsel

Mark L. Esposito
Andrew Hanson
Penn, Stuart & Eskridge, P.C.
804 Anderson Street
Bristol, TN 37620
(423) 793-4812
Email: mesposito@pennstuart.com
Email: ahanson@pennstuart.com

-and-

Jonathan L. Gold (*pro hac vice motion* pending)
LeClairRyan, A Professional Corporation
225 Reinekers Lane, Suite 700
Alexandria, Virginia 22314
(703) 684-8007
Email: jonathan.gold@leclairryan.com

*Counsel for Empire Petroleum Holdings, LLC*

## Certificate of Service

The undersigned hereby certifies that on August 31, 2009 the foregoing was filed electronically and served via the Court's CM/ECF system. Court's electronic filing system to all parties indicated on the electronic filing receipt, including the following:

Mark Dessauer, Esq.
Hunter, Smith and Davis
1212 North Eastman Road
PO Box 3740
Kingsport, Tennessee 37664
    Counsel for the Debtor

Patricia Foster, Esq.
Attorney for the U.S. Trustee
800 Market Street
Suite 114, Howard Baker U.S. Courthouse
Knoxville, Tennessee 37902

Glen B. Rose, Esq.
Harwell Howard Hyne Gabbert & Manner, P.C.
315 Deaderick Street, Suite 1800
Nashville, Tennessee 37238
    Counsel for GreyStone Credit II, L.L.C.

John F. Teitenberg, Esq.
Frost Brown Todd, LLC
424 Church Street, Suite 1600
Nashville, Tennessee 37219-2308
    Counsel for Committee of Unsecured Creditors

Douglas L. Lutz, Esq.
Frost Brown Todd, LLC
2299 PNC Center, 201 East Fifth Street
Cincinnati, Ohio 45202
    Counsel for Committee of Unsecured Creditors

Brent C. Strickland, Esq.
Stephen B. Gerald, Esq.
Whiteford, Taylor & Preston, LLP
Seven Saint Paul Street
Baltimore, Maryland 21202
    Counsel for Committee of Unsecured Creditors

/s/Mark L. Esposito