**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
(Greeneville Division)**

| | | |
|---|---|---|
| In re: | * | Chapter 11 |
| **APPALACHIAN OIL COMPANY, INC.,** | * | Case No. 2:09-bk-50259 |
| Debtor. | * | |

* * * * * * * * * * * * *

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION
TO DEBTOR'S DISCLOSURE STATEMENT**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 bankruptcy case of Appalachian Oil Company, Inc. (the "Debtor"), the above-captioned debtor and debtor-in-possession, by and through its undersigned counsel, respectfully files this Objection (the "Objection") to the Debtor's proposed Disclosure Statement (the "Disclosure Statement"), and in support thereof, states as follows.

**Introduction**

1. In its Disclosure Statement, the Debtor states that in the event it is not able to collect sufficient monies through preference recoveries to pay allowed administrative claims and unsecured priority claims, it may bring a legal action seeking to invade the settlement funds designated and earmarked by Order of this Court to pay the claims of unsecured creditors and the Committee's professional fees. The settlement in question was extensively negotiated and the designation of these funds for the exclusive payment of claims of general unsecured creditors was a critical part of the global settlement between the Debtor, the Committee, the Debtor's secured lender, certain of the Debtor's major landlords, and the Debtor's former shareholders. Indeed, as the Debtor has often stated, this global settlement was a necessary precursor to the

sale of its assets. Despite the entry of this Court's order approving the settlement, the Debtor now apparently seeks to reserve the right to breach the terms of the settlement agreement and Court Order approving same, which would require the Court to unwind the multi-party, multi layered settlement previously approved by the Court. The Debtor's failure to fully describe the full impact and effect of its "reservation of rights" fails to provide the voting constituency with adequate information for purposes of voting on the proposed Plan of Liquidation.

**Background**

2. On June 10, 2009, the Court entered an Order Approving Compromise and Settlement by and Among Debtor, Official Committee of Unsecured Creditors, Greystone Business Credit II, L.L.C., Former Shareholders, and Landlords (the "Settlement Order"). The Settlement Order approved an extensively negotiated global compromise and settlement by and between the Debtor, the Committee, Greystone Business Credit II, L.L.C. ("Greystone"), Management Properties, Inc. ("MPI"), MacLean, Inc. ("MacLean"), and the Jack W. Cummins, Sr. Irrevocable Trust for the Children of Jack W. Cummins, Jr., Sara G. MacLean, Inc. (the successor to the Jack W. Cummins, Sr. Irrevocable Trust for the Children of Jill C. Maclean), and the Linda R. Maclean Irrevocable Trust (collectively, the "Cummins Trust", and together with MPI and MacLean, the "Landlords"), and the Debtor's former shareholders (the "Former Shareholders").

3. Pursuant to the Settlement Order, upon the closing of the settlement agreement (as defined in the Motion for Approval of Compromise and Settlement filed with the Court on May 8, 2009 and attached thereto as an exhibit), the Former Shareholders and the Debtor directed and authorized Branch Banking and Trust Company (the "Escrow Agent") under the Escrow Agreement dated September 7, 2007 among the Debtor, Titan Global Holdings, Inc, the Former

2

Shareholders and the Escrow Agent to release and disburse $750,000 of the monies on deposit (the "Escrow Monies") in the Escrow Fund (as defined in the Escrow Agreement) to counsel for the Committee.

4. As set forth in the Settlement Order, the Escrow Monies, upon their release or disbursement from the Escrow Fund, to the Committee, shall be segregated and held by counsel for the Committee to be used solely for distributions to general unsecured creditors and payment of approved fees and expenses of the Committee's professionals. Settlement Order at p. 3. Landlords and Former Shareholders, however, are precluded from recovering on any of their claims against the Debtor and the Debtor's estate from the Escrow Monies. Settlement Order at p. 4. Additionally, Greystone's share of any distributions made to general unsecured creditors from the Escrow Monies shall be limited to 17% of the amount distributed to general unsecured creditors from such funds. *Id.*

5. The Settlement Order also provides that, upon the closing of the settlement agreement, there shall be carved out from Greystone's liens and claims to the net sale proceeds from the sale of the assets of the Debtor's estate for the benefit of general unsecured creditors, the following amounts:

    A. $250,000 of the first proceeds in excess of $4 million of the net sale proceeds paid to Greystone;

    B. 5% of all net sale proceeds in excess of $4,250,000 until net sale proceeds of $8 million are reached;

    C. 10% of all net sale proceeds in excess of $8 million until net sale proceeds of $10 million are reached; and

    D. 5% of all net sale proceeds in excess of $10 million.

(the "Unsecured Creditor Carveout", and together with the Escrow Monies, the "Committee Fund"). Settlement Order at 5. Pursuant to the Settlement Order, the Unsecured Creditor Carveout must be set aside and paid to counsel for the Committee and used solely for distribution to general prepetition unsecured creditors and payment of allowed fees and expenses of the Committee's professionals. Settlement Order at 6.

6. As the result of subsequent agreements and resolution of disputes, the Unsecured Creditor Carveout was revised so that the Committee was entitled to the first of $275,000 of the first proceeds distributed to Greystone in excess of $4.5 million. Thereafter, the Committee is entitled to a percentage of sale proceeds received by Greystone over $4,750,000.

7. Following closing of the sale of substantially all of the Debtor's assets, the Committee has received approximately $304,000 of sale proceeds.[1]

## The Disclosure Statement

8. On October 2, 2009, the Debtor filed its proposed Disclosure Statement and Plan of Liquidation (the "Disclosure Statement"). Section VII.F of the Disclosure Statement provides as follows:

> The Plan proposed a liquidation of APPCO. Proceeds from the Committee Fund have by the Settlement Order been directly allocated to Claims of Unsecured Creditors and the payment of Committee professionals. If the Debtor is unable to collect sufficient monies through preference recoveries to pay Allowed Administrative Claims and Priority Claims in full, then an issue may arise under the absolute priority rule. <u>If necessary or required, the Debtor will make demand and seek recovery of these funds from the Committee for the benefit of creditors whose Claims have priority to those of Unsecured Creditors</u>.

Disclosure Statement at p. 30 (emphasis added).

---

[1] The Committee is entitled, under the Unsecured Creditor Carveout, to an additional amount of sale proceeds, in an amount in excess of $45,000, for which it has made demand on Greystone to pay.

4

## **Standard for Approval of Disclosure Statements**

9. The adequacy of a disclosure statement is governed by § 1125 of the Bankruptcy Code, which provides that,

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor's assets.

11 U.S.C. § 1125(b). As it pertains to § 1125(b), subsection (a) provides the following definition:

> "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a).

10. Whether a disclosure statement provides adequate disclosure is "left essentially to the judicial discretion of the court" and … "the information required will necessarily be governed by the circumstances of the case." *In re Keisler*, 2009 Bankr. LEXIS 1814, *9 (Bankr. E.D. Tenn. 2009) (citations omitted). Courts determine adequacy on a case-by-case basis. *See id.* at *10.

11. Generally, a disclosure statement must contain all pertinent information bearing on the success or failure of the proposals in the plan of reorganization and must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it and what contingencies there are to getting its distribution. *See id.* at *11 (citing *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

## **Argument**

12. Under the terms of the Settlement Order, the Committee Fund can be used solely for distribution to general prepetition unsecured creditors and payment of allowed fees and expenses of the Committee's professionals. As a result, the Committee Fund is not available to fund any other claims in this case.

13. Despite this unequivocal fact, the Debtor in its Disclosure Statement apparently seeks to reserve the right to bring an action in violation of the Settlement Order to try and utilize the Committee Fund to pay expenses of the estate.

14. The Disclosure Statement fails to state that any such action by the Debtor would violate the Settlement Order. It fails to disclose that the Committee would vigorously oppose any such actions and seek all appropriate remedies against the Debtor and its estate. The Disclosure Statement also fails to indicate that, in the unlikely event the Debtor was successful in such an action, it is likely that the Court would have to unwind the <u>entire</u> settlement, which would result in additional litigation, such as action to avoid all of Greystone's liens on the Debtors assets and the sale proceeds attributable to such assets and the institution of fraudulent conveyance claims against the Debtor's former shareholders. All of these claims were released as part of the settlement specifically conditioned to the payment of funds to the Committee. If any of the settlement were to be unwound it would have to be unwound in its entirety.

15. The Disclosure Statement also fails to set forth any legal basis of the Debtor to renege on the Settlement Agreement and seek to violate the Settlement Order. Even in cases where parties have challenged such settlements <u>before the settlement was approved</u>, courts have approved such settlements. Indeed, case authority indicates that there is in fact no such legal basis. *In re World Health Alternatives, Inc.*, 344 B.R. 291 (Bankr. D. Del. 2006) is particularly instructive. In that case, the debtor, the creditors committee and the debtor's secured lender sought approval of a settlement pursuant to which the parties agreed to, *inter alia*, a collateral carve-out in the amount of $1,625,000 for the benefit of unsecured creditors and committee counsel fees. In exchange, the creditors committee agreed to, *inter alia*, withdraw or waive its objections to pending sale motion and to the extent, validity and priority of the secured lender's lien against the debtor's assets. The United States Trustee objected to the proposed settlement on the grounds that the court was prohibited from approving a settlement that resulted in a distribution to general unsecured creditors before payment to priority tax creditors was made. *See id.* at 295.

16. In approving the settlement, the *World Health Alternatives* court noted that settlements are generally favored in bankruptcy and whether to approve a settlement is within the discretion of the bankruptcy court. *See id.* at 295-96. In exercising discretion, and assessing and balancing the value of the claim being compromised against the value to the estate of the acceptance of the compromise proposal, the court considered four factors: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *Id.* at 296.

17.     In *World Health Alternatives*, the court focused on the fact that the settlement represented "global peace" among the debtors, the committee and the bank. *See id.* Similarly, in the case at bar, the Settlement Order resolved claims by and between the Debtor, the Committee, Greystone, certain of the Debtor's landlords and the Former Shareholders. The *World Health Alternatives* court also found that although the general unsecured creditors were receiving money before priority creditors, that money did not belong to the estate, but rather to the bank. *See id.* at 297 (citing *Official Comm. Of Unsecured Creditors v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1313 (1st Cir. 1993).

18.     In *SPM*, the court noted that the distribution scheme of §726 of the Bankruptcy Code (and by implication, the priorities of § 507) does not come into play until all valid liens on the property are satisfied. *See id.* at 1312. If a lien is perfected and not otherwise invalidated by law, it must be satisfied out of the assets it encumbers before any proceeds of the assets are available to claimants, including those having priority. *See id.* The SPM court found that absent the settlement order in that case, the entire sale proceeds belonged to the bank in satisfaction of its lien, leaving nothing for the estate to distribute to the other creditors. The court noted that "it is hard to see how the priority creditors lost anything owed them given the fact there would have been nothing left for priority creditors after the $5 million was distributed to Citizens." *Id.* Creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including to share them with other creditors.

19.     The *World Health Alternatives* court found that "the absolute priority rule … is not implicated here because the settlement does not arise in the context of a plan of reorganization." *Id.* at * 298. Similarly, in the case at bar, the Settlement Order was entered months ago and does not arise in the context of the Debtor's proposed Plan. Even if the absolute

8

priority rule applies, which it does not, the *World Health Alternatives* case suggests that "an ordinary carve out would not offend the rule in the case of a liquidation. In the case at bar, the Debtor's plan is one of liquidation, not reorganization.

20.     Accordingly, despite the Debtor's assertion, the absolute priority rule does not require that the Court unwind the Settlement Order or provide the Debtor with access to the Committee Fund.  The suggestion that the Debtor has the authority to demand monies from the Committee Fund is erroneous, misleading and, therefore, fails to provide the voting constituency with adequate information in determining whether to vote in favor of or against the Plan.

21.     Most importantly, unlike *World Health Alternatives* and *SPM*, the settlement which the Debtor indicates it <u>might</u> challenge, has already been approved by the Court, all parties have acted in reliance on that settlement.  Funds have been paid to multiple parties, in addition to the Committee, based on the Settlement Order.  If the Debtor believed that it was not permissible to set aside funds for the unsecured creditors, it should not have (i) agreed to do so, and (ii) asked the Court to approve the settlement doing so.  However, it did both and now suggests it can, months after the Settlement Order and reliance on the Settlement Order by all of the parties, seek to unilaterally vacate the global settlement that it presented to the Court for approval.

WHEREFORE, the Official Committee of Unsecured Creditors respectfully requests that the Court deny approval of the Disclosure Statement.

                                              Respectfully submitted,

                                              WHITEFORD, TAYLOR & PRESTON L.L.P.

                                              /s/  John F. Carlton

>Brent C. Strickland (MD#22704)
>John F. Carlton (MD#06591)
>Stephen B. Gerald (MD#26590)
>Seven Saint Paul Street
>Baltimore, Maryland 21202
>Telephone: (410) 347-8700
>Facsimile: (410) 725-6510
>Email: bstrickland@wtplaw.com
>　　　  jcarlton@wtplaw.com
>　　　  sgerald@wtplaw.com
>
>-and-
>
>FROST BROWN TODD, LLC
>
>John F. Teitenberg (TN#21940)
>424 Church Street, Suite 1600
>Nashville, Tennessee 37219-2308
>Telephone: (615) 251-5550
>Facsimile (615) 251-5551
>Email: jteitenberg@fbtlaw.com
>
>Douglas L. Lutz (OH#0064761)
>2200 PNC Center
>201 East Fifth Street
>Cincinnati, Ohio 45202
>Telephone: (513) 651-6800
>Facsimile: (513) 651-6981
>Email: dlutz@fbtlaw.com
>
>*Counsel for the Official Committee of Unsecured Creditors*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was electronically filed and served via the Court's ECF system this 6th day of November, 2009.

>/s/ John F. Teitenberg

1877932/v2