**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF TENNESSEE**
**GREENEVILLE**


| | | |
|---|---|---|
| IN RE: | * | |
| | * | |
| **APPALACHIAN OIL COMPANY, INC.** | * | **CASE NO. 2:09-bk-50259** |
| | * | **Chapter 11** |
| **Debtor** | * | |

# AMENDED
## DISCLOSURE STATEMENT
## AND
## PLAN OF LIQUIDATION


Appalachian Oil Company, Inc. ("APPCO" or "Debtor") submits the following Amended Disclosure Statement and Plan of Liquidation.


# DISCLOSURE STATEMENT


THE HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS AMENDED DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS. FURTHERMORE, APPROVAL OF THIS AMENDED DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN OF LIQUIDATION DISCLOSED HEREIN (THE "PLAN").  THIS AMENDED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THIS AMENDED DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, CERTAIN OTHER DOCUMENTS AND CERTAIN FINANCIAL INFORMATION. THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS AMENDED DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS OR FINANCIAL INFORMATION TO BE INCORPORATED HEREIN BY REFERENCE, THE PLAN SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS AMENDED DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF THEIR REVIEW THAT THE FACTS SET FORTH HEREIN HAVE NOT CHANGED UNLESS SO SPECIFIED HEREIN. EACH HOLDER OF A CLAIM OR INTEREST SHOULD CAREFULLY REVIEW THE PLAN, THIS AMENDED DISCLOSURE STATEMENT AND ANY EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY BEFORE CASTING A BALLOT.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS AMENDED DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS AMENDED DISCLOSURE STATEMENT. HOLDERS OF CLAIMS OR INTEREST HOLDERS SHOULD NOT RELY UPON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

ALTHOUGH THE DEBTOR HAS USED ITS BEST EFFORTS TO ENSURE THE ACCURACY OF FINANCIAL INFORMATION PROVIDED IN THIS AMENDED DISCLOSURE STATEMENT, ANY FINANCIAL INFORMATION CONTAINED IN THIS AMENDED DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

ANY PROJECTIONS PROVIDED IN THIS AMENDED DISCLOSURE STATEMENT HAVE BEEN PREPARED BY DEBTOR'S MANAGEMENT OR DEBTOR'S COUNSEL IN CONSULTATION WITH DEBTOR'S MANAGEMENT. THE DEBTOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF ANY PROJECTIONS OR TO THE DEBTOR'S ABILITY TO ACHIEVE THE PROJECTED RESULTS INCLUDING THE PROJECTED DIVIDEND TO UNSECURED CREDITORS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM THOSE ASSUMED. ALTERNATIVELY, THESE EVENTS AND CIRCUMSTANCES MAY HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. ANY PROJECTIONS, INCLUDING THE ESTIMATED DIVIDEND TO UNSECURED CREDITORS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

See Article VI, Section E, of this Amended Disclosure Statement, "Risk Factors," for a discussion of certain risk factors that a holder of a claim or equity interest should consider in deciding whether to accept the Plan.

Debtor believes that the Plan is feasible, fair and equitable and that confirmation of the Plan is in the best interests of creditors and interest holders.

# TABLE OF CONTENTS

**Page(s)**

**DISCLOSURE STATEMENT**

| | | | |
|---|---|---|---|
| **I.** | **Background**.................................................................. | | 1 |
| | A. | General Background Information.................................................. | 1 |
| | | 1. General Background.................................................. | 1 |
| | | 2. Titan Global Holdings, Inc. Stock Acquisition........................ | 1 |
| | | 3. Real Estate Purchase Agreement and Lease Back.............. | 1 |
| | | 4. Greystone Financing.................................................. | 2 |
| | B. | Events Leading To Chapter 11 Filing.............................................. | 3 |
| | | 1. Status After Titan Acquisition.................................... | 3 |
| | | 2. Economic Conditions and Actions by Greystone.................. | 3 |
| | C. | Summary of Events During Chapter 11 Case.................................. | 4 |
| | | 1. Appointment of Official Committee of Unsecured Creditors.. | 4 |
| | | 2. Cash Collateral Orders.............................................. | 4 |
| | | 3. DIP Financing.......................................................... | 5 |
| | | 4. Appointment of Chief Restructuring Officer..................... | 6 |
| | | 5. The Debtor's Unexpired Leases.................................... | 7 |
| | | 6. Settlement Agreement With Management Properties, Inc., MacLean, Inc. and Affiliated Entities..................................... | 8 |
| | | 7. Restructured Leases with MPI, MacLean and Cummins....... | 10 |
| | | 8. Sales Procedure and Retention of NRC Realty Advisors, LLC, as Sales Agent.................................... | 10 |
| | | 9. Marketing of Debtor's Assets.................................... | 11 |
| | | 10. Bulk Bids for Debtor's Assets.................................... | 12 |
| | |     a. Empire Petroleum Holdings, LLC........................ | 12 |
| | |     b. Bid of Florida Sunshine Investments I, Inc............. | 13 |
| | | 11. Motion to Sell Property to Florida Sunshine..................... | 14 |
| | | 12. Closing of Sale to Florida Sunshine and Distribution of Sale Proceeds.......................................................... | 15 |
| | | 13. Management Agreement.............................................. | 16 |
| **II.** | **Means of Execution of Plan**........................................................ | | 17 |
| **III.** | **Summary of Treatment of Claims Under Plan**.............................. | | 17 |
| | A. | Treatment of Claims.................................................................... | 17 |
| | | 1. Class 1 - Administrative Expense Claims........................ | 17 |
| | | 2. Class 2 - Priority Claims............................................ | 20 |
| | | 3. Class 3 - Unsecured Claims....................................... | 21 |
| **IV.** | **Manner of Voting**...................................................................... | | 23 |
| | A. | Classes Entitled to Vote.............................................................. | 23 |
| | B. | Procedure for Voting................................................................... | 23 |

| | | | Page |
|---|---|---|---|
| **V.** | **Confirmation of the Plan**................................................................ | | 23 |
| | A. | Solicitation of Acceptance of the Plan.................................... | 23 |
| | B. | Votes Considered in Determining Acceptance of the Plan................ | 24 |
| | C. | Hearing on Confirmation of the Plan........................................ | 24 |
| | D. | Determining Whether Impaired Classes Have Accepted the Plan.... | 24 |
| | E. | Confirmation of the Plan Without Consent of All Impaired Classes.. | 25 |
| **VI.** | **The Debtor**................................................................................. | | 26 |
| | A. | The Debtor.......................................................................... | 26 |
| | B. | Management......................................................................... | 26 |
| **VII.** | **Summaries of Debtors' Assets and Liabilities**................................ | | 26 |
| | A. | Assets................................................................................ | 26 |
| | | 1. Committee Fund.................................................... | 27 |
| | | 2. Debtor Chapter 5 Claims....................................... | 27 |
| | | 3. Post-Petition Receivables...................................... | 30 |
| | B. | Liabilities........................................................................... | 30 |
| | C. | Liquidation Analysis.............................................................. | 30 |
| | D. | Risk Factors........................................................................ | 31 |
| | E. | Feasibility........................................................................... | 31 |
| | F. | Absolute Priority Rule........................................................... | 32 |
| | G. | Litigation............................................................................ | 33 |
| | | a. Suit Against Titan Global Holdings, Inc..................... | 33 |
| | | b. Preferential Transfer Claims.................................... | 33 |
| | H. | Bar Date............................................................................. | 34 |

**PLAN OF LIQUIDATION**

| | | |
|---|---|---|
| Article I - Introduction................................................................ | | 35 |
| Article II - Overview of Chapter 11................................................ | | 35 |
| Article III - Definitions............................................................... | | 37 |
| Article IV - Construction............................................................. | | 40 |
| Article V - Classification of Claims and Interests.............................. | | 40 |
| Article VI - Means for Execution of the Plan.................................... | | 40 |
| Article VII - Treatment of Claims and Interests Under the Plan............. | | 40 |
| 7.01. Class 1 - Administrative Claims............................... | | 41 |
| 7.02. Class 2 - Priority Claims........................................ | | 41 |
| 7.03. Unsecured Claims................................................. | | 42 |
| 7.04. Class 4 - Interest Holder......................................... | | 43 |
| 7.05. Class 5 - Executory Contracts................................. | | 43 |
| Article VIII - Effective Date........................................................ | | 43 |
| Article IX - Modification of Plan................................................... | | 43 |
| Article X - Final Decree.............................................................. | | 44 |
| Article XI - U. S. Trustee's Fees and Monthly Operating Reports......... | | 44 |
| Article XII - General Provisions.................................................... | | 45 |
| 12.01. Jurisdiction....................................................... | | 45 |
| 12.02. Interpretation.................................................... | | 46 |
| 12.03. Binding Effect................................................... | | 46 |
| 12.04. Applicable Law.................................................. | | 46 |
| 12.05. Implementation Orders......................................... | | 46 |
| CERTIFICATE OF SERVICE........................................................ | | 47 |

# AMENDED DISCLOSURE STATEMENT

## I. BACKGROUND

**[Capitalized terms used herein but not otherwise defined herein shall have the meaning given to such terms in the Plan.]**

### A. General Background Information

#### 1. General Background

At the time of the filing of its bankruptcy petition, APPCO was headquartered in Blountville, Tennessee. It operated sixty-five (65) retail convenience stores in East Tennessee, Southwest Virginia and Eastern Kentucky. It also provided services as a petroleum fuel jobber to numerous dealers in the above geographic locations along with Western North Carolina and Southern West Virginia.

#### 2. Titan Global Holdings, Inc. Stock Acquisition

On September 17, 2007, Titan Global Holdings, Inc. ("Titan") completed the acquisition of all the issued and outstanding shares of capital stock of APPCO from the James R. MacLean Revocable Trust, Sara G. MacLean, the Linda R. MacLean Irrevocable Trust and Jeffrey H. Benedict. The purchase price paid for the APPCO shares was $30,000,000 in cash, of which $1,000,000 was escrowed for an eighteen (18) month period following the closing of the acquisition in order to secure Titan's potential claims against the selling shareholders for any breach of their representations, covenants and warranties under the stock purchase agreement between Titan and the selling shareholders.

#### 3. Real Estate Purchase Agreement and Lease Back

Immediately after the closing of the acquisition by Titan of the APPCO shares on September 17, 2007, APPCO and its wholly-owned subsidiary, APPCO-KY, Inc., entered into a

purchase and sale agreement with YA Landholdings, LLC and YA Landholdings 7, LLC pursuant to which APPCO and APPCO-KY, Inc. sold certain real property located in Kentucky, Tennessee and Virginia for a purchase price of $15,000,000 in cash. The purchase price was used to fund a portion of the acquisition of the APPCO shares. Certain of these properties were then leased back to APPCO by YA Landholdings, LLC for a term of twenty (20) years pursuant to land and building lease agreements for each separate location.

### 4.    Greystone Financing

On September 17, 2007, APPCO entered into a loan and security agreement with Greystone Business Credit II, L.L.C. ("Greystone") and certain other lenders wherein Greystone, as lender and agent for certain other lenders, provided a revolving credit facility in the amount of up to $20,000,000 (the "Loan Agreement") less the balance under certain term notes then existing and owing by Titan and certain affiliates of Titan, Titan PCB West, Inc., Titan PCB East, Inc., Oblio Telecom, Inc., Titan Wireless Communications, Inc., Start Talk, Inc. and Pinless, Inc. Under the Loan Agreement, monies were to be advanced to APPCO based upon (i) ninety percent (90%) of eligible accounts receivable, and (ii) the sum of up to forty-five percent (45%) of eligible convenience store inventory plus up to seventy-five percent (75%) of eligible fuel inventory. Greystone was paid a $200,000 commitment fee as consideration for this financing arrangement. In addition, APPCO paid Greystone a facility fee and renewal term facility fee of .675% and a monthly loan service fee of .25% balance on the average loan balance outstanding. The Loan Agreement was secured by substantially all the assets of Titan.

Approximately $15,000,000 of the Greystone credit facility was used to fund the acquisition of the APPCO shares.

**B.**     **Events Leading to Chapter 11 Filing**

    **1.**     **Status After Titan Acquisition**

The financing for the APPCO shares was in the form of a leverage buy-out, that is, it involved a financial arrangement under which the purchaser (Titan) borrowed all of the purchase price for the APPCO stock and secured the borrowed funds by security interests and/or mortgages on the assets of APPCO. Additionally, approximately $3,000,000 of APPCO's cash was used to fund a portion of the purchase of the APPCO shares at closing. This created immediate cash-flow problems for APPCO which increasingly worsened over the following fifteen (15) month period. The amount of debt and lease obligations created by the Titan stock transaction left APPCO with insufficient capital to operate and this was essentially the case immediately after the closing of the stock transaction. In addition, during the following eighteen (18) month period, Titan caused APPCO to transfer for Titan's benefit the sum of $4,951,673.23 which was a substantial drain on APPCO's cash.

    **2.**     **Economic Conditions and Actions by Greystone**

Notwithstanding the amount of indebtedness of APPCO following the APPCO share acquisition and the use of APPCO's cash by Titan, APPCO was able, for the most part, to produce positive cash flow through September, 2008 and a portion of October, 2008. In October of 2008, there was an unprecedented decrease in fuel prices at the pump. This impacted APPCO's ability to borrow under the Loan Agreement because of the decrease in its collateral value. The decrease in fuel prices also resulted in a decline in APPCO's overall revenues.

The Loan Agreement with Greystone operated with a lockbox arrangement. All credit card receipts received by APPCO went to a lockbox controlled by Greystone. As APPCO's collateral base decreased, Greystone began retaining all the credit card receipts and withholding advances under the Loan Agreement because the collateral base would not support

further advances. Greystone also refused to consider other assets of APPCO as collateral for future advances and used APPCO's cash to reduce the indebtedness including the payment of various fees charged by Greystone. As a result of Greystone's actions, APPCO was forced to operate on sixty percent (60%) of its cash flow while, at the same time, facing substantial deceases in revenues. Because of its lack of cash and the lack of vendor credit terms, APPCO was unable to fully stock its convenience stores with groceries and fuel. In late Fall of 2008, these inventory levels continued to decrease and some stores went dark for a period of time. APPCO was also unable to supply its dealer accounts with fuel and the dealers began buying their fuel from other sources. APPCO also defaulted on its lease obligations to its various landlords and, due to these defaults and the risk of loosing its leasehold interests in its convenience store locations, APPCO filed a voluntary Chapter 11 petition on February 9, 2009.

C. **Summary of Events During Chapter 11 Case**

       1. **Appointment of Official Committee of Unsecured Creditors**

On February 24, 2009, the Court appointed the Official Committee of Unsecured Creditors (the "Committee"). On April 10, 2009, the Court approved the retention of Whiteford, Taylor & Preston, L.L.P. as attorneys to the Committee, and Frost, Brown, Todd, LLC as co-counsel to the Committee (collectively "Committee Counsel"). Also, on April 10, 2009, the Court approved the employment of Protiviti, Inc. as financial advisors to the Committee.

       2. **Cash Collateral Orders**

During the initial stages of the case, there were a series of cash collateral orders authorizing the Debtor to use Greystone's cash collateral on an interim basis, primarily for the purpose of the payment of employee wages and salaries (pre-petition and post-petition), health insurance premiums, utility deposits, and other operating expenses. The Court entered interim orders authorizing the use of cash collateral on February 13, 2009; February 20, 2009; March 4,

2009; March 10, 2009; and March 13, 2009.  These interim orders were later converted to final orders.

### 3. DIP Financing

On March 16, 2009, the Court entered an Agreed Interim Order Authorizing Debtor in Possession Financing and Use of Cash Collateral.  Under this Order, Greystone agreed to provide up to $500,000.00 in debtor-in-possession financing for the purposes that were set forth in the Debtor's budget which were principally operating expenses of the Debtor's business.  The Court also authorized the Debtor to secure financing from LP Shanks Company or another grocery vendor and from certain fuel vendors.  The financing provided by these vendors was to be fourteen (14) day terms and each fuel vendor and LP Shanks were provided with deposits of up to $150,000.  The initial advances under the debtor-in-possession financing went directly to these vendors as deposits.  The grocery vendors and fuel vendors were granted first priority security interests in the product they supplied.  Also, under the March 16, 2009 Order, Greystone was granted a first priority security interest in the unencumbered assets of the Debtor subject to the liens and security interests of the product vendors, except for any avoidance claims of the Debtor under the applicable sections of Chapter 5 of the Bankruptcy Code.

On April 14, 2009, the Court signed the Final Order Authorizing Debtor in Possession Financing and Use of Cash Collateral (the "Final Order") under which, *inter alia*, the Court authorized and approved the Debtor to obtain post-petition credit from Greystone under a debtor-in-possession loan facility (the "DIP Facility") for an amount of up to $2,000,000.00, the proceeds of such loan to be used by Debtor in accordance with budget attached thereto and pursuant to the terms and conditions of the Final Order; the obtaining of post-petition credit from LP Shanks Company, or another grocery supplier and fuel suppliers on credit in exchange for a first priority security in the products supplied by such vendor and the proceeds thereof; and the use of cash collateral for the purposes set forth in the budget.  Under the Final Order and in

addition to the other protection previously granted Greystone, Greystone was granted a superpriority claim under Section 364(c)(1) over all other administrative expenses in the case, except the fees of the United States Trustee, in the amounts advanced under the DIP Facility, plus the cash collateral used by the Debtor, plus $625,000.00 (the "Superpriority Claim").

On June 1, 2009, the Court signed Amendment to Final Order Authorizing Debtor in Possession Financing and Use of Cash Collateral increasing the availability under the DIP Facility to $2,400,000 and adopting all other provisions of the previous Orders. On June 11, 2009, the Court signed the Second Amendment to Final Order Authorizing Debtor in Possession Financing and Use of Cash Collateral increasing the availability under the DIP Facility to $3,150,000 and adopting and incorporating all other provisions of the previous Orders. On July 20, 2009, the Court signed the Third Amendment to Final Order Authorizing Debtor in Possession Financing and Use of Cash Collateral and Amendment to Settlement Order (the "Third Amended Order") increasing the availability under the DIP Facility to $3,350,000 and adopting all other provisions of the previous Orders. On July 28, 2009, the Court signed the Fourth Amendment to Final Order Authorizing Debtor in Possession Financing and Use of Cash Collateral increasing the availability under the DIP Facility to $3,900,000 and adopting all other provisions of the previous Orders. The DIP Facility expired on August 30, 2009 and no advances were made after that date. Approximately $3,500,000 was owed under the DIP Facility when it terminated on August 30, 2009.

4. **Appointment of Chief Restructuring Officer**

In the Final Order, the Court appointed P.A. Weber, III, as the Debtor's Chief Restructuring Officer (the "CRO"). The CRO was charged with the responsibility for all operational and financial matters of the Debtor, as well as the marketing and sale of the Debtor's assets. Also, upon entry of the Final Order, the members of the Debtor's Board of Directors were deemed to have resigned and Mr. Weber was elected as the Debtor's sole

director.  Mr. Weber then took over the management of APPCO pending the sale of the company's assets.  (*See infra*).  Mr. Weber will continue in the capacity as CRO through the liquidation of the Debtor as proposed in the Plan.

### 5.  The Debtor's Unexpired Leases

As of the Petition Date, the Debtor's convenience stores were located on properties in which the Debtor was the lessee or sub-lessee or, in some instances, the sub-lessor.  As of the Petition Date, the lease agreements to which the Debtor was a party were unexpired leases of non-residential real property and thereby covered by the provisions of 11 U.S.C. § 365 with respect to any assumption or rejection thereof.  The Debtor filed motions and obtained authority from the Court to reject eight (8) unexpired leases.  Following the granting of these motions, the Debtor remained parties to lease agreements governing its remaining forty-seven (47) convenience store locations.

On April 28, 2009, the Debtor filed a motion pursuant to 11 U.S.C. § 365(d)(4)(B)(i) seeking an extension for additional ninety (90) days to assume or reject the unexpired leases to which the Debtor was a party and not previously rejected.  The Debtor's motion was granted and the time period extended until September 7, 2009 for the Debtor to assume or reject the unexpired leases, except with respect to the Debtor's lease agreement with Frank Haws (the "Haws Lease") and the Ground Lease and Operating Agreement between the Debtor and McDonald's Corporation (the "McDonald's Lease").  On June 10, 2009, an order was entered granting the Debtor until September 7, 2009 to assume or reject the Haws Lease.  On July 28, 2009, an order was entered granting the Debtor until September 8, 2009 to assume or reject the McDonald's Lease.  The foregoing enabled the Debtor to extend the time to assume or reject leases through the maximum time period allowed by the Bankruptcy Code without the consent of the landlords.

**6.** **Settlement Agreement With Management Properties, Inc., MacLean, Inc. and Affiliated Entities**

At the time of its bankruptcy filing, the Debtor, as tenant or lessee, was a party to certain master leases with Management Properties, Inc. ("MPI") (the "MPI Lease"); MacLean, Inc. ("MacLean") (the "MacLean Lease"); the Jack W. Cummins, Sr. Irrevocable Trust for the Children of Jack W. Cummins, Jr., Sara G. MacLean; and the Linda R. MacLean Irrevocable Trust (collectively "Cummins") (the "Cummins Lease"). The MPI Lease covered in excess of sixty (60) properties that included direct leases, subleases and lease pass-through arrangements. The MacLean Lease covered six (6) properties, including the Debtor's corporate headquarters in Blountville, Tennessee. The Cummins Lease covered two (2) properties.

On March 25, 2008, MPI, MacLean and Cummins filed motions for relief from the automatic stay seeking to terminate the MPI Lease, the MacLean Lease and the Cummins Lease. On April 30, 2009, the Debtor filed motions seeking to reject certain of the properties covered by the MPI Lease, the MacLean Lease and the Cummins Lease and to restructure the leases by eliminating certain properties covered thereby and revising the Debtor's rental obligations to the respective landlords. Following the filing of the stay relief motion by MPI, MacLean and Cummins and the rejection motions by the Debtor, the parties entered into negotiations which led to a settlement agreement in principal.

On May 8, 2009, the Debtor filed a motion for approval of compromise and settlement with MPI, MacLean and Cummins which included, among other things, the restructuring of the MPI Lease, the MacLean Lease and the Cummins Lease. After a series of objections, negotiations and court hearings, the Court, on June 10, 2009, entered an Order Approving Compromise and Settlement By and Among Debtor, Official Committee of Unsecured Creditors, Greystone Business Credit II, L.L.C., Former Shareholders, and Landlords (the "Settlement Order").

The Settlement Order provided for, *inter alia*, the division of a $1,000,000 escrow fund held by Branch Banking & Trust Company between the former shareholders of APPCO and the Committee; approved the settlement between the Debtor, MPI, MacLean and Cummins which included the proposed restructuring of the three (3) master leases; granted Greystone a first priority, unavoidable lien on the assets of the Debtor, with the exception of the Debtor's avoidance claims and the proceeds thereof; provided for a division of the sale proceeds from the sale of the assets of the Debtor's estate between Greystone and the Committee (for the benefit of general unsecured creditors); and for a blanket release of Greystone by the Debtor and the Committee.

The Settlement Order was amended by the Third Amended Order wherein the division of the proceeds from the sale of the Debtor's assets were revised as follows:

(a)  Greystone would receive the first $4,200,000 of the net sale proceeds.

(b)  The Committee would receive the first $250,000 of the net sale proceeds in excess of $4,200,000.

(c)  The Committee will receive five percent (5%) of the net sale proceeds in excess of $4,450,000 up to $8,200,000.

(d)  The Committee will receive ten percent (10%) of the net sale proceeds in excess of $8,200,000 up to $10,200,000.

(e)  The Committee will receive five percent (5%) of all net proceeds in excess.

The Third Amended Order provided for the modification of the above formula if the obligations under the DIP Facility exceeded $3,350,000 provided that the amount in paragraph (b) above would not exceed $4,500,000, absent written consent of the Committee and the amount in paragraph (c) above would not exceed $4,750,000, absent written consent of the Committee.

7. **Restructured Leases with MPI, MacLean and Cummins**

Following entry of the Settlement Order, the Debtor entered twelve (12) new lease agreements dated May 1, 2009 with either MPI, MacLean or Cummins covering the remaining properties covered by the terms of the parties' settlement agreement (the "Restructured Leases"). Six (6) of the twelve (12) Restructured Leases were master leases covering multiple properties and were titled Master Lease 1, Master Lease 2, Master Lease 3, Master Lease 4, Master Lease 5 and Master Lease 6. The remaining six (6) leases were individual leases covering individual properties. On July 16, 2009, APPCO, the former APPCO shareholders, MPI, MacLean, Cummins, Greystone and the Committee entered into a Settlement Agreement and Release of All Claims providing for blanket releases of Greystone and the former shareholders of APPCO and documenting the terms and conditions of the Settlement Order.

8. **Sales Procedure and Retention of NRC Realty Advisors, LLC as Sales Agent**

On May 8, 2009, the Debtor filed a motion for approval to implement sales procedures seeking approval of sales procedures in the form attached as Exhibit No. 1 to the motion (the "Sale Procedures') for the sale of substantially all the assets of the Debtor pursuant to such procedures. On May 20, 2009, the Court entered an Order approving the Debtor to immediately implement to Sales Procedures. On May 11, 2009, the Debtor filed an application to employ NRC Realty Advisors, LLC ("NRC") to serve as the Debtor's real estate sales agent and financial advisor in accordance with the engagement letter attached as Exhibit No. 1 to the motion. The Court approved the retention of NRC by Order entered May 20, 2009. NRC, thereafter, assumed the obligation to market and sell the assets of the Debtor pursuant to the Sale Procedures.

### 9. Marketing of Debtor's Assets

After entry of the Settlement Order and the execution of the Restructured Leases, NRC commenced its formal efforts to market and sale the assets of the Debtor pursuant to the Sales Procedures. These marketing efforts consisted of utilization of NRC's existing data base of parties which had previously purchased or expressed interest in the purchase of convenience stores; advertisements in publications such as the *Wall Street Journal* and trade magazines; e-mail blasts; the establishment of an electronic book or memorandum describing the properties and other relevant financial information; and the establishment of a virtual "deal room" available for viewing and inspection by interested bidders which contained applicable documents regarding the properties and the financial performance of the store locations. NRC made direct contract with over one hundred thirty (130) regional buyers of groups of convenience stores as well as companies with a national presence in the ownership of convenience stores. NRC also established a procedure for bids to be submitted in accordance with the Sales Procedures. The NRC bid deadline expired on July 8, 2009.

NRC, thereafter, received a series of bids from prospective purchasers of individual stores and certain groups of stores. NRC only received two "bulk bids," that is, bids for all locations, but one (1) bulk bid had numerous conditions attached to it including the requirement of further break up of the Restructured Leases and transfer of the ownership of the underground storage tanks to the respective landlords. The particular bid was not feasible to attempt to close. The only viable "bulk bid" received by NRC was from Empire Petroleum Holdings, LLC.

10.   **Bulk Bids for Debtor's Assets**

a.   **Empire Petroleum Holdings, LLC ("Empire")**

Empire initially submitted a "bulk bid" of $9.1 million to purchase substantially all the assets of APPCO and the assumption of the unexpired leases (sometimes collectively hereinafter the "Purchased Assets") plus the value of APPCO's inventory [fuel and groceries] (the "Inventory") as of the closing date. The parties, thereafter, negotiated the terms of and entered into a Purchase and Sale Agreement dated as of July 24, 2009 (the "Empire Purchase Agreement"). The Empire Purchase Agreement contained a due diligence period of fifteen (15) business days (the "Due Diligence Period") for Empire to review the financial information previously provided by NRC and review financial information of the Debtor through July 9, 2009. Subject to certain conditions, including Empire's acknowledgment that APPCO was operating with severely limited operating capital; was operating as a debtor in possession in bankruptcy; and that APPCO's locations were dark for a period of 2009, Empire had the right to terminate the Empire Purchase Agreement prior to the expiration of the Due Diligence Period if the "2009 financial information was unacceptable to [Empire]."

After conducting further due diligence, Empire issued a termination letter dated August 13, 2009 giving notice of its termination of the Empire Purchase Agreement on the grounds that the 2009 financial information was unacceptable to Empire. On August 14, 2009, Empire revoked its termination letter and made a counter-offer under the Empire Purchase Agreement of $5.5 million. Empire and the Debtor, thereafter, entered into further negotiations.

On August 21, 2009, Empire and APPCO signed an Amendment to Purchase and Sale Agreement dated as of April 18, 2009 amending the Empire Purchase Agreement

such that the purchase price was reduced to $5.5 million plus the costs of the Inventory; the closing date was pushed back to August 31, 2009 and no later than September 4, 2009 and, if the later date, Empire would pay the Debtor's September 2009 rents and its operating expenses for such gap period; all contingencies to closing were waived except court approval and execution of conveyance documents; the deposit was increased to $486,000; and APPCO was permitted to secure a competing offer that was at least five percent (5%) greater than the Empire $5.5 million offer with Empire having the opportunity to submit another bid that was $100,000.00 better than the competing offer; and providing to Empire, if it was the unsuccessful bidder, a break-up fee of five percent (5%) of its $5.5 million purchase price with the break-up fee being subject to court approval.

### b.    Bid of Florida Sunshine Investments I, Inc.

On or about August 18, 2009, APPCO was contacted by representatives of Florida Sunshine Investments I, Inc. ("Florida Sunshine"), as a potential bulk bidder that had not previously participated in the bidding process through the Sale Procedures. On August 21, 2009, APPCO and Florida Sunshine signed a term sheet which contained an outline of proposed terms of purchase of assets subject to a definitive purchase agreement. On August 25, 2009, APPCO and Florida Sunshine entered into a Purchase and Sale Agreement (the "Florida Sunshine Purchase Agreement") providing for Florida Sunshine's purchase and sale of substantially all the assets of APPCO described therein for a purchase price of $6,250,000.00 plus the value of the Inventory. In addition to the assets described in the Empire Purchase Agreement, the assets to be purchased under the Florida Sunshine Purchase Agreement included: (1) APPCO's rights, if any, under dealer supply agreements at the certain dealer locations including the equipment at those locations; (2) certain claims of APPCO

against Bryan Chance[1] and Kurt Jensen[2] arising in this bankruptcy case; (3) any dealer supply agreement not previously sold by the Debtor and equipment at those dealer sites; and (4) certain miscellaneous equipment that APPCO previously intended to auction and which was not included in the Empire Purchase Agreement.  Upon analyzing the Empire bid, the Florida Sunshine Purchase Agreement, and certain back-up bids, the Debtor determined that the Florida Sunshine bid represented the highest and best bid for its assets and proceeded to seek Court approval.

### 11.  <u>Motion to Sell Property to Florida Sunshine</u>

On August 25, 2009, the Debtor filed a motion to: (1) sell property and assume and assign executory contracts and unexpired leases free and clear of liens and encumbrances; (2) amend sale procedures; and (3) authorize debtor to enter into management agreement.  This motion sought the approval of the Court for the Debtor to sell substantially all its assets to Florida Sunshine pursuant to the Florida Sunshine Purchase Agreement; assume its unexpired leases and assign same to Florida Sunshine; and for the Debtor to enter a management agreement with Florida Sunshine.

A hearing was held on September 1, 2009 at which time the Court heard evidence and approved the proposed transactions with Florida Sunshine.  The Order approving the sale of the Debtor's assets to Florida Sunshine and the granting of the other requested relief was filed on September 1, 2009.

---

[1]  **Bryan Chance is a former officer and director of APPCO and an officer and director of Titan Global Holdings, LLC, APPCO's parent company.  He is a named defendant in a pending adversary proceeding in this bankruptcy case styled: <u>Appalachian Oil Company, Inc. and the Official Committee of Unsecured Creditors v. Titan Global Holdings, Inc., et al</u>, Adversary Proceeding No. 2:09-ap-05049.**

[2]  **Kurt Jensen is an officer or former officer of Titan.**

## 12.   Closing of Sale to Florida Sunshine and Distribution of Sale Proceeds

After the hearing on September 1, 2009, the parties proceeded to close the Florida Sunshine transaction. The closing documents were signed and finalized by the parties on and before September 2, 2009, and Florida Sunshine commenced the formal operation of the Debtor's business on that date.

NRC acted as escrow agent and distribution agent for the closing of the Florida Sunshine transaction. The following is a summary of the sale proceeds and subsequent distribution thereof:

| | | |
|---|---|---|
| Total Sale Proceeds: | | $8,832,533.99 |
| | | |
| Deductions and Pro-Rations: | | |
| Deposit: | $500,000.00 | |
| Rent Pro-Ration (9/1/09 - 9/02/09): | $  17,872.90 | |
| Taxes: | | |
| Real Estate Tax Pro-Ration | | |
| (1/1/09 to 8/31/09): | $170,682.78 | |
| August Sales Tax Accrual: | $140,000.00 | |
| Payroll Pro-Ration (9/1/09 - 9/02/09): | $173,175.11 | |
| | $1,001,730.49 | |
| | | |
| Amount Due From Florida Sunshine: | | $7,830,802.90 |
| Broker Commission to NRC: | | $  188,029.04 |
| Net Sale Proceeds to Seller [APPCO]: | | $7,642,773.86 |
| | | |
| Disbursements From Net Sale Proceeds: | | |
| | | |
| Lease Cures (Pre-Petition and Post-Petition) | | $369,717.29 |
| Tax Cures Under Leases | | $282,798.17 |
| Escrow (Post-Closing Lease Cures and U.S. Trustee Fees) | | $  50,000.00[3] |
| Expense Reimbursement (NRC) | | $  42,799.38 |
| Fuel Inventory Reconciliation (Due Florida Sunshine) | | $  71,455.44 |
| Merchandise Inventory Reconciliation (Due Florida Sunshine) | | $  64,488.99 |
| KERP [Key Employee Retention Plan] (4 Employees) | | $  22,352.54 |
| Debtor Legal Fees | | $  50,000.00 |
| Priority Lien Holders (Fuel and Merchandise) | | $1,183,094.50 |
| Committee | | $304,738.45 |
| Greystone | | $5,676,587.23 |

The above sale proceeds have now been fully distributed to the respective recipients.

---

[3]   **Any monies not used for unknown or unresolved lease cures or for payment of U.S. Trustee fees will be paid to Greystone.**

There remains a dispute between Greystone and the Committee regarding the right to a certain portion of the sale proceeds arising from sale of the Inventory. The Committee contends that, under the Settlement Order, the Committee is entitled to five percent (5%) of the net sale proceeds from the sale of the Inventory. Greystone contends that, since fuel vendors and LP Shanks had a priority lien on the Inventory and its proceeds, the Committee has no entitlement to a share of these proceeds and that the Inventory was no different than the various vendor deposits which were sold directly to Florida Sunshine for which the Committee received no percentage share. Greystone also contends that the sale of the Inventory to Florida Sunshine was treated separately and independently from the $6.25 million purchase price. The monies in dispute have been sent by the Debtor to Greystone and the Committee has made demand for its claimed five percent (5%) of such proceeds from Greystone. This dispute may result in subsequent litigation between Greystone and the Committee, but will not involve the Debtor. The Debtor has no interest in these funds.

### 13. **Management Agreement**

As part of the Florida Sunshine transaction and as an accommodation to Florida Sunshine, the Debtor entered into a Management Agreement with Florida Sunshine, Sunshine Energy TN I, LLC, Sunshine Energy TN II, LLC, Sunshine Energy KY I, LLC, Sunshine Energy VA I, LLC, Sunshine RE TN 1, LLC, and Sunshine Management, LLC (collectively the "Buyer") (the "Management Agreement"). Under the Management Agreement, the Buyer is permitted to operate APPCO's former business under licenses, permits and insurance policies previously issued to APPCO and to use APPCO's workforce for such purposes with the Buyer being responsible for all fees and expenses relative thereto. The term of the Management Agreement is ninety (90) days from September 1, 2009 with a renewal term of thirty (30) days. The Buyer also agrees to indemnify APPCO from claims arising under the Management Agreement or

Buyer operating under any alcohol, lottery or tobacco license issued to APPCO or Buyer's operation thereunder.

## II.   MEANS OF EXECUTION OF PLAN

The funding for the Plan will come from three (3) sources, the Committee Fund, preference recoveries collected by the Debtor, and post-petition receivables due the Debtor. (*See* Section VII hereof).

## III.   SUMMARY OF TREATMENT OF CLAIMS UNDER PLAN

The Plan is a liquidation plan that calls for the liquidation of APPCO's remaining assets and the distribution of the proceeds derived therefrom in accordance with the Plan.  APPCO has three classes of creditors, administrative claimants, priority claimants and the class of Unsecured Creditors.

### A.   Treatment of Claims

#### 1.   Class 1 - Administrative Claims

The holders of Allowed Administrative Claims entitled to priority under Section 501(a)(1) of the Bankruptcy Code, entities entitled to payment under Sections 546(c) and 553 of the Bankruptcy Code, and entities entitled to payment of administrative expenses pursuant to Sections 503 and 507(a) of the Bankruptcy Code shall receive an account of such Allowed Claims or administrative expense cash in the amount of such Allowed Claim or administrative expense on or before the Effective Date of the Plan or as soon thereafter as practicable. Notwithstanding the foregoing, professionals employed at the expense of the Estate pursuant to

Section 503(b)(2)-(6) of the Bankruptcy Code shall receive cash in the amount awarded to such professionals and entities as soon thereafter as practicable after an order is entered by the Court approving such award pursuant to Section 330 or 503(b)(2) - (6) of the Bankruptcy Code, unless any such professional or other entity consents prior to confirmation to the treatment.

The following are the estimated Administrative Claims of the Estate:

| Entity | Status | Amount Paid To Date | Future Claims |
|---|---|---|---|
| Hunter, Smith & Davis, LLP | Debtor's Counsel | $170,000.00 | $200,000.00 (Estimated) |
| Whiteford, Taylor & Preston, L.L.P. | Committee Counsel | $170,681.00[4] | Unknown[5] |
| Protiviti, Inc. | Committee Financial Advisor | $ 91,378.00[6] | $ 8,392.00[7] |
| | Debtor's Accountant (Estimated) | | $ 25,000.00 |
| Third-Party Vendors | | | $ 37,678.89[8] |
| Chief Restructuring Officer (Estimated) | | | $ 50,000.00 |
| Empire Petroleum Holdings, LLC | | | $ 85,000.00 |

On November 9, 2009, the Debtor filed a motion to set a bar date of January 15, 2009 for the filing of administrative expense claims and claims under § 503(b)(9) of the Bankruptcy Code [Document No. 771] which was granted by Order signed December 9, 2009 [Document No. 787]. The administrative expense claims filed within the above bar date and the Debtor's response thereto are summarized below.

---

[4]  **All but $40,000 of this amount was paid from the funds held by the Committee pursuant to the Settlement Order.**

[5]  **On September 23, 2009, Committee Counsel filed a second application for interim compensation seeking approval for payment of $112,683 plus expenses of $1,952.37. If this application is granted, the total fees and expenses awarded the Committee Counsel would total $285,316.37**

[6]  **This amount was paid from the funds held by the Committee pursuant to the Settlement Order.**

[7]  **On September 23, 2009, the Committee's financial advisor filed a second and final interim application for payment of this amount.**

[8]  **These monies were not paid from the sale proceeds at the closing of the Florida Sunshine transaction as these vendors did not have liens that had priority to that held by Greystone.**

| CLAIMANT | SUMMARY OF CLAIM | AMOUNT | DEBTOR'S RESPONSE AND STATURE |
|---|---|---|---|
| Bottling Group, LLC d/b/a The Pepsi Bottling Group ("PBG" | This is a claim under § 503(b)(9) for beverage products delivered by PBG to APPCO Stores within twenty (20) days of the Petition Date. | $10,402.89 | The Debtor does not dispute the amount of this claim or its status as a § 503(b)(9) claim, but contends that it possesses a claim for avoidable transfers under 11 U.S.C. § 547(b) which exceed the amount of the § 503(b)(9) claim. The Debtor and PBG are currently attempting to resolve the respective claims against each other. If the claims cannot be resolved, then the Debtor intends to file an adversary proceeding seeking to: (a) offset any liability to PBG, and (b) recover the value of the preferential transfers from PBG. |
| R. J. Reynolds Tobacco Company ("RJR") | This claim arises from a Settlement, Release and Cooperation Agreement dated August 31, 2006 (the "RJR Settlement Agreement"). RJR contends that APPCO's pre-petition obligations under the RJR Settlement Agreement arise to an administrative expense priority claim [*See* Document No. 806]. RJR also contends that the Settlement Agreement and a separate marketing agreement were executory contracts not rejected by the Debtor. | $312,333.00 | The Debtor disputes the claim of RJR and has filed an objection thereto [Document No. 825]. The Debtor contends that any obligations under the RJR Settlement Agreement is a pre-petition obligation; the consideration for the RJR Settlement Agreement occurred pre-petition; the RJR Settlement Agreement does not constitute an executory contract; and the Debtor received no post-petition benefit under the RJR Settlement Agreement. A hearing is scheduled for February 16, 2010. The Debtor anticipates litigating this claim and there are no pending settlement discussions. |
| GEC, LLC | This is a claim for monies due under an Agreed Order filed June 30, 2009 [Document No. 511]. | $1,500.00 plus attorney's fees of $315.00 | The Debtor does not dispute the $1,500 administrative expense claim, but does dispute and has filed an objection to the attorney fee portion of the claim [Document No. 821]. The basis for this objection is that, under the June 30, 2009 Agreed Order [Document No. 511], the administrative expense claim was capped at $1,500. A hearing on the claim and the Debtor's objection is scheduled for February 16, 2010. The Debtor anticipates litigating its objection regarding the $315.00 attorney fee claim. |
| Gordon and Judy Brown and Brown's Pantry, Inc. | This is an administrative expense claim for the stub rent period of February 10-28, 2009 on a rejected lease [*See* Document No. 801]. | $999.00 | The Debtor has objected to this claim on the grounds that, under applicable law, the rent for the post-petition stub period is a pre-petition claim. A hearing on the claim and the Debtor's objection is scheduled for February 16, 2010. The Debtor believes this presents an issue of law for the Court. |

| YA Landholdings, LLC and YA Landholdings 7, LLC ("YA") | This claim arises from a fire that occurred at a rejected lease location of the Debtor (APPCO No. 80 - Carter County, KY). YA contends that the Debtor converted certain insurance policy proceeds, although the claim is not specific as to the type of policy or what proceeds were converted. [*See* Document No. 804]. | $87,499.98 | The Debtor has filed objections to this claim [Document No. 822] and anticipates litigating this dispute. The Debtor asserts that any claim that YA may have in whatever form pled is a rejection claim and, therefore, a prepetition claim under applicable law. A hearing on this dispute is scheduled for February 16, 2010. |
|---|---|---|---|
| Crescent Oil Company, Inc. ("Crescent") | This is a § 503(b)(9) claim for fuel delivered to the Debtor within the twenty (20) day period prior to the Petition Date. [*See* Document No. 798]. | $14,593.83 | The Debtor does not dispute this claim or the amount, but contends that it has a claim against Crescent for avoidable transfers under § 547(b) that exceed the amount of this claim entitling the Debtor to the affirmative defense of setoff. The Debtor is in the process of attempting to resolve this dispute short of further litigation. |
| Furrs 1, LLC, Furrs 2, LLC and Sierra Partners, LLC (collectively "Claimant") | Claimant is the assignee of Greystone pursuant to an Assignment dated November 30, 2009. Among the items assigned to Claimant was "[a]ny claims, administrative, or other rights in the bankruptcy case . . ." of the Debtor. Claimant contends that it holds a superpriority claim consisting of pre-petition collateral consumed by the Debtor, DIP facility obligations, $625,000 as set forth in the Final Order and certain expenses incurred in the sale of the Debtor's assets to Florida Sunshine [*See* Document No. 802]. | $2,775,723.57 | The Debtor has objected to this claim on the grounds that it was fully satisfied from the Florida Sunshine sale proceeds [Document No. 819]. The Debtor is in the process of attempting to settle this claim together with the Titan litigation (*see infra*) and believes an overall compromise and settlement will be shortly filed. |

## 2. Class 2 - Priority Claims

The Debtor scheduled total Priority Claims of $623,554.69. This amount includes $180,192.23 in employee PTO (personal time off) claims; $48,411.40 in employee benefit claims;[9] and $394,951.06 in taxes.

---

[9] **This amount represented pre-petition and post-petition amounts due Blue Cross/Blue Shield of Tennessee for employee health insurance premiums. This amount was paid post-petition pursuant to Court authorization.**

Under 11 U.S.C. § 507(a)(4), each employee priority claim for PTO or other employee benefits is limited to $10,950 and the amount must be earned within one hundred eighty (180) days of the Petition Date. The balance of any individual claims for employees in excess of $10,950 or that were earned more than one hundred eighty (180) days prior to the Petition Date will be treated as Unsecured Claims under the Plan.

The tax portion of the Priority Claims consist primarily of fuel taxes which were unpaid as of the Petition Date. However, Travelers Casualty and Surety Company of America ("Travelers") issued bonds to government authorities to secure the payment of fuel taxes in the aggregate penal sum of $1,611,000. APPCO pledged cash collateral totaling $625,030.71 to secure such bonds. This amount is being liquidated as claims on the bonds are being made and the taxes are paid. The Debtor anticipates that its fuel and related tax liability will be paid from the bonds issued by Travelers resulting in no direct claim by the taxing authorities against the Estate. The Debtor does not anticipate recovering any of the cash collateral that was pledged to secure the bonds.

In addition to the fuel taxes, the Debtor owes pre-petition personal property taxes that were not paid as part of the Florida Sunshine closing. Other Priority Claims have been filed, but which the Debtor has yet to fully evaluate. The Debtor estimates total Priority Claims of $250,000.

### 3.    Class 3 - Unsecured Claims

The Debtor scheduled total unsecured claims of $7,189,924.51.

A total of 424 claims have been filed in the case in the aggregate amount of $77,941,196.43. However, a number of these claims are duplicative and most are subject to some form of objection. Included in this amount is a claim filed by YA Global Investments, LP of $6,958,027.40 which is not a claim against the Debtor; a claim by Titan in the amount of $17,973,465.40 which the Debtor believes is unenforceable; and two claims by Greystone which

total $38,480,800.  [Claim Nos. 399 and 400].  Claim No. 399 includes APPCO's pre-petition indebtedness of $10,911,947.74 to Greystone plus $16,610,238.28 arising from APPCO's corporate guaranty of Titan's indebtedness to Greystone.  Claim No. 400 is in the amount of $10,958,614.l48 and arises from an APPCO corporate guarantee of the indebtedness of USA Detergents, Inc., a Titan affiliate, to GBC Funding, LLC, a Greystone affiliate.  These claims have now been assigned to Furrs 1, LLC, Furrs 2, LLC and Sierra Partners, LLC.  These three (3) claims account for over $52,000,000 of the total claims filed.  The Claim deadline has passed.

Greystone received $5,676,587.23 of the Florida Sunshine sale proceeds.  The Debtor believes this amount was more than sufficient to satisfy the Superpriority Claim and has taken that position in its objection to the administrative and Superpriority Claim filed by Greystone's assignees.  (*See infra).*  As a result, the Superpriority Claim is not treated in the Plan as an administrative expense or otherwise.  The remainder of Greystone's Claim is unsecured.  The Debtor believes that the ongoing settlement negotiations involving Titan, the Titan litigation and the Superpriority Claim will resolve any remaining disputes with Greystone regarding the claims originally held by it and the value thereof.

The Debtor estimates total Allowed Unsecured Claims of from $30 to $35 million.  This amount may increase or decrease depending on the enforceability of the APPCO corporate guaranties including the amount of the indebtedness due from the principal obligors.

## IV.  MANNER OF VOTING

### A.  Classes Entitled to Vote

The Plan divides the Claims of Creditors and Interest Holders into classes.  Only classes of Creditors and Interest Holders with claims or interests impaired under a plan of reorganization are entitled to vote on a plan.  Generally, and subject to the specific provisions of the Bankruptcy Code, this includes creditors and interest holders whose claims or interests, under a plan, will be modified in terms of principal, interest, length of time for payment, or a combination of the above.  Each holder of a Claim in a Class that is not Impaired under the Plan is conclusively presumed to have accepted the Plan, and solicitation of acceptances from the holders of such Claims is not required and will not be undertaken.

The Debtor anticipates securing sufficient funds to pay the holders of Administrative Claims and Priority Claims in full.  However, these claimants will be treated as Impaired under the Plan.  Unsecured Creditors are Impaired under the Plan.

### B.  Procedure for Voting

All Creditors entitled to vote may cast their vote by completing, dating, and signing a ballot that will be presented to them pursuant to subsequent orders of the Court.  Inasmuch as the Plan is a liquidation plan as opposed to a reorganization plan, no votes will be solicited from Interest Holders.

## V.  CONFIRMATION OF THE PLAN

### A.  Solicitation of Acceptance of the Plan

This Disclosure Statement must be approved by the Bankruptcy Court in accordance with Section 1125 of the Bankruptcy Code (11 U.S.C. § 1125).  It will then be provided to all Creditors, Interest Holders, and parties in interest of APPCO.  This Disclosure Statement is

intended to assist Creditors with their evaluation of the Plan and their decision to accept or reject the Plan. Your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement at the time of, or before, such solicitation.

**B.** **Votes Considered in Determining Acceptance of the Plan**

When acceptance of the Plan is determined by the Court, in accordance with <u>Bankruptcy Code</u> Section 1126 (11 <u>U.S.C.</u> § 1126) and <u>Fed. R. Bankr. P.</u> 3018, votes of Creditors will only be counted if submitted by Creditors with Allowed Claims. If you are in any way uncertain if or how your Claim has been scheduled, you should review the Debtor's schedules and any amendments thereto which are on file with the Clerk's Office of the United States Bankruptcy Court, located at 220 West Depot Street, Greeneville, Tennessee 37743.

**C.** **Hearing on Confirmation of the Plan**

If this Disclosure Statement is approved, the Court will set a hearing to determine if the Plan has been accepted by the required number of holders of Claims and interests and if other requirements for confirmation of the Plan outlined in the <u>Bankruptcy Code</u> have been satisfied. You will be notified when a hearing on confirmation of the Plan is scheduled. Any objections to confirmation of the Plan must be in writing and must be filed with the Clerk of the Court and served on counsel for the Debtors within the time set by the Court.

**D.** **Determining Whether Impaired Classed Have Accepted the Plan**

At the scheduled hearing on Confirmation of the Plan, the Bankruptcy Court must determine, among other things, if the Plan has been accepted by each Impaired Class. Under Section 1126(c) of the Code (11 <u>U.S.C.</u> § 1126(c)), an Impaired Class of Claims is deemed to have accepted the Plan if Class members holding at least two-thirds (2/3) in amount and more than one-half (1/2) in number of all Allowed Claims of Class members actually voting have voted in favor of the Plan. Under § 1126(d) of the <u>Bankruptcy Code</u> (11 <u>U.S.C.</u> § 1126(d)), an

Impaired Class of Interests is deemed to have accepted the Plan if Class members holding at least two-thirds in amount of the Allowed Interests of Class members actually voting have voted in favor of the Plan. Further, under Section 1129 of the Bankruptcy Code (11 U.S.C. § 1129(a)(7)(A)(ii)), the Bankruptcy Court must also find that each member of an Impaired Class will receive or retain as much under the Plan as the member would receive or retain if the Debtors were liquidated, as of the Effective Date of the Plan, under Chapter 7 of the Bankruptcy Code. This is known as the "best interest of creditors' test."

**E.      Confirmation of the Plan Without Consent of all Impaired Classes**

The Plan may be confirmed even if not accepted by all Impaired classes, if the Bankruptcy Court finds that all other requirements of Confirmation under Section 1129(a) of the Bankruptcy Code (11 U.S.C. § 1129(a)) are satisfied and certain additional conditions are met. These conditions are set forth in Section 1129(b) of the Bankruptcy Code (11 U.S.C. § 1129(b)), and require, generally, a showing that the Plan does not discriminate unfairly and that the Plan if "fair and equitable" with respect to each Class of Claims and Interests that is Impaired under, and has not accepted, the Plan. In order to be "fair and equitable" as required by Section 1129(b) of the Bankruptcy Code, the Plan must provide that Creditors and Interest Holders in non-consenting, Impaired Classes will either receive or retain on account of their Claims or Interests, property of a value, as of the Effective Date of the Plan, at least equal to the value of such Claims or Interests or, if they receive less than full value, no Class with a junior priority will receive or retain anything on account of such junior claim or interest. If the Plan is not accepted by an Impaired Class or Classes, the Debtors will rely on the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code and seek confirmation of the Plan.

With respect to confirmation of a plan under the provisions of 11 U.S.C. § 1129(b), at least one impaired class of creditors must accept a proposed reorganization plan, determined without any acceptance of such plan by an insider. The term "insider" is defined in the

Bankruptcy Code to include an "affiliate" of the debtor. 11 U.S.C. § 101(31)(E). The term "affiliate" is defined in the Bankruptcy Code to include an entity that owns or holds twenty percent (20%) or more of the outstanding securities of the Debtor. 11 U.S.C. § 101(2)(A). The principal and perhaps only insider that has filed a Claim is Titan.

## VI. THE DEBTOR

### A. The Debtor

APPCO is a Tennessee corporation which, due to the sale of substantially all its assets, is no longer an operating entity. APPCO continues to assist Florida Sunshine with the transition of APPCO's business under the Management Agreement and any pre-sale issues that remain unresolved including any lease cures that have not been paid or satisfied. The Plan provides for the liquidation of APPCO and then the dissolution and termination of its corporate existence.

### B. Management

#### P. A. "Andy" Weber, III, Chief Restructuring Officer.

Mr. Weber was appointed as Chief Restructuring Officer of APPCO by Order filed April 14, 2009. Mr. Weber is the sole officer and sole director of the Debtor. He will continue in that capacity through the liquidation of the Debtor and its dissolution under Tennessee law.

## VII. SUMMARIES OF DEBTORS' ASSETS AND LIABILITIES

### A. Assets

The Debtor's remaining assets consist of the following: (1) monies held by the Committee (the "Committee Fund"), (2) the Debtor's claims under Chapter 5 of the Bankruptcy Code, and (3) the Debtor's post-petition receivables.

### 1. Committee Fund

Pursuant to the Settlement Order, the Committee initially received the sum of $725,000 from the $1,000,000 escrowed proceeds that has been segregated and held by the Committee to be used solely for distribution to general unsecured creditors and payment of approved fees and expenses of Committee professionals. In addition, the Committee has received $304,738.45 of the sale proceeds from the Florida Sunshine transaction.[10] These funds are also to be used solely for distribution to general unsecured creditors and payment of approved fees of Committee professionals. These two amounts total $1,029,738.45. Committee professional fees and expenses approved to date total $270,913.40, $40,000 of which was paid by the Debtor, leaving an estimated balance in the Committee Fund of $798,825.05. Committee professionals have filed second interim applications for fees totaling $123,027.39. Assuming these fees are approved and paid from the Committee Fund, the balance in the Committee Fund will be $675,798.05. The Debtor presently does not have any basis to estimate the amount of further reductions in the Committee Fund for any additional Court-approved fees of Committee professionals. Inasmuch as the Debtor is proceeding with its liquidation through the Plan, it anticipates that further Committee professional fees will not be substantial.

### 2. Debtor Chapter 5 Claims

Except for the claim against Titan and the Debtor's former directors described in Section G of this Article VII, *infra*, the Debtor's claims under Chapter 5 of the Bankruptcy Code consist of preferential transfers subject to avoidance under 11 U.S.C. § 547.

Under 11 U.S.C. § 547(b), the Debtor may avoid as a preferential transfer and recover the transfer or the value thereof from the recipient creditor that are likely to be advanced by the

---

[10]    **The Committee has asserted a claim for certain additional funds from the Florida Sunshine transaction.  (*See* Page 15, *supra*).**

creditor/defendant in the Debtor's preference suits, a transfer or payment by the Debtor of an interest in property: (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor to the creditor before the payment was made; (3) made while the debtor was insolvent; (4) made within ninety (90) days before the date of the filing of the bankruptcy petition; and (5) enabled the creditor to receive more than the creditor would have received if the debtor was liquidated in Chapter 7. The debtor is presumed insolvent during the 90 days before the date that its bankruptcy petition is filed. The Debtor believes it can establish each of the above elements of a preferential transfer for each of the preference claims the Debtor intends to pursue.

There are certain defenses to a preference claim. The two (2) defenses that have the greatest likelihood of being applicable to the Debtor's preference claims are the ordinary course of business defense and the new value defense. The ordinary course of business defense provides a creditor with a defense if the transfer or payment was made in the ordinary course of business of the debtor and creditor or the transfer was made according to ordinary business terms. The defense can be established on subjective basis, that is, by analyzing the transaction history between the debtor and creditor or on an objective basis, by analyzing such transactions according to applicable industry standards. The new value defense is available to the creditor if the creditor provides new value in the form of new goods or services after the preferential payment was received. For example, if the debtor receives a $1,000 payment from the creditor within the 90 day preference period and, after the creditor receives the payment, it ships additional goods of $500, then the creditor can offset the $500 shipment against the $1,000 payment, leaving a net preference exposure to the creditor of $500. This rule has been held to apply by the Court even if the new value advanced is paid.

The Debtor paid creditors a total of $22,401,492.10 within the 90 days before the Petition Date. However, not all these payments are subject to avoidance as preferential

transfers and defenses may exist to some of the transfers. The largest potential recoveries for the Debtor are estimated and summarized below:

| Creditor | Payments Received Within 90 Day Preference Period |
|---|---|
| AMOCO/BP | $6,383.484.00 |
| CITGO Petroleum Corp. | $4,834,121.00 |
| Marathon Ashland Petroleum, LLC | $3,912,961.00 |
| Valero Marketing & Supply Co. | $1,070,427.00 |
| Conoco-Phillips | $1,721,274.00 |
| LP Shanks[11] | $1,301,000.00 |

There are also a number of other preference claims that are available to the Debtor which are not summarized above and which range from $10,000 to $500,000.

The Debtor has yet to be provided sufficient detail with respect to any defenses available to these or the other creditors against which the Debtor intends to pursue preference claims. One potential barometer, at least with respect to the new value defense, is the claims filed by certain of the above creditors. For example, Conoco-Phillips has filed a claim in the amount of $561,293.23 [Claim No. 15]. CITGO Petroleum Corporation has filed a claim in the amount of $1,040,341.12 [Claim No. 363], and Marathon Ashland Petroleum, LLC has filed a claim in the amount of $1,400,549.98 [Claim No. 384]. These claims are substantially less than the amount of preference payments received as reflected above. Moreover, the Debtor's fuel vendors stopped making fuel available to the Debtor in the approximate 30 day period before its bankruptcy filing, making substantial new value advances unlikely. Upon review of the above claims, it also appears that payment terms changed during the preference period and a number of invoices for which payment is sought are outside the ninety (90) day preference period.

---

[11] **In the Final Order, the Debtor agreed to waive any preference claim against LP Shanks if LP Shanks provided 14 day terms for groceries, tobacco and other in-store merchandise. However, LP Shanks never provided greater than 12 day terms after the entry of the Final Order. Thus, the Debtor currently intends to pursue this preference claim against LP Shanks.**

These factors, if established, could assist the Debtor in overcoming the primary defenses available to these creditors.

The Debtor believes that it has a high likelihood of recovering substantial monies for the benefit of the Estate through preference litigation.

### 3.    Post-Petition Receivables

The Debtor has post-petition receivables totaling approximately $70,000.00. It is currently in the process of attempting to collect these funds from its account debtors.

## B.    Liabilities

The Debtor scheduled total liabilities of approximately $18,815,306. To date, four hundred twenty-four (424) claims have been filed totaling $77,941,196.43. The Debtor anticipates objecting to a number of these claims through the claim objection process. After this process is completed, the Debtor estimates a total liabilities or parties having Allowed Unsecured Claims ranging from $30 million to $35 million. This amount could increase depending on the liability of APPCO on the corporate guaranties previously discussed.

## C.    Liquidation Analysis

APPCO believes that the Plan will produce a greater recovery for holders of Claims than would be achieved in a Chapter 7 liquidation. This is primarily due to less expenses related to a Chapter 11 liquidation plan as opposed to a liquidation under Chapter 7. In addition, Mr. Weber  is familiar with the various recovery areas open to the Debtor and has the benefit of continuing to operate under the Management Agreement with Florida Sunshine.

If the case is converted to a case under Chapter 7, there are trustee fees and attorney's fees that would be incurred. Under 11 U.S.C. § 326 and § 330, a trustee appointed in a Chapter 7 case is entitled to a fee for the trustee's services. These fees are based on the following schedule based on monies disbursed or turned over in the case to parties-in-interest by the trustee:

> 25% of the first $5,000 or less,
>
> 10% of the amount in excess of $5,000 but less than $50,000,
>
> 5% of the amount in excess of $50,000 but less than $1,000,000, and
>
> 3% of the amount in excess of $1,000,000.

If for example, there are $5,000,000 in preference recoveries, the trustee's fees would be $170,000. These fees would not be incurred under the Plan. In addition, a Chapter 7 trustee would incur substantial amounts in attorney's fees given the work necessary to become familiar with the various aspects of this bankruptcy case. Mr. Weber and the Debtor's counsel are already familiar with the various aspects of this bankruptcy case.

## D.   **Risk Factors**

PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR INTEREST SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDING, WITHOUT LIMITATION, ANY EXHIBITS ATTACHED HERETO.

## E.   **Feasibility**

One of the requirements for confirmation is that the Plan be feasible, that is, it is not to be followed by liquidation or the need for further liquidation. The CRO is in place to continue and complete the liquidation and pursue preference recoveries. Given that the Plan calls for liquidation, the feasibility requirement should not be a material factor in the Plan confirmation process.

## F.    Absolute Priority Rule

The absolute priority rule involves the application of the requirement that a plan of reorganization's treatment of a particular class of creditors is "fair and equitable."  11 U.S.C. § 1129(b)(1).   Generally, the absolute priority rule prevents a junior class of creditors from receiving a payment or value in excess of a class of creditors senior to it.   A plan which proposes to treat a junior class of creditors more favorable than a senior class of creditors violates the absolute priority rule and is, therefore, not fair and equitable.

The Plan proposes a liquidation of APPCO.  Proceeds from the Committee Fund have by the Settlement Order been directly allocated to Claims of Unsecured Creditors and the payment of Committee professionals.  If the Debtor is unable to collect sufficient monies through preference recoveries to pay Allowed Administrative Claims and Priority Claims in full, then an issue may arise under the absolute priority rule.  If necessary or required, the Debtor will make demand and seek recovery of these funds from the Committee for the benefit of creditors whose Claims have priority to those of Unsecured Creditors.   The Debtor also believes that the Settlement Order, as amended, was entered into under circumstances of mistake in that the Debtor would not have agreed to the Committee Fund absent the belief that sufficient funds would be available for the payment of administrative expense claims of the bankruptcy estate.  Thus, the Debtor may seek relief from the Settlement Order pursuant to Fed. R. Civ. P. 60(b).

Any effort by the Debtor to seek recovery from the Committee for the payment of administrative expenses or priority claims of the bankruptcy estate will be strenuously opposed by the Committee.  It is the Committee's position that any such effort by the Debtor would be a breach of the Debtor's previous agreement as set forth in the Settlement Order and a violation of the Settlement Order itself.   Moreover, the Committee also takes the position that the provisions of the Settlement Order regarding the use of the Committee Fund is an integral part of the agreements that constitute the Settlement Order, which included multiple other parties,

payments to other parties and releases of parties against which the Debtor had numerous claims (all of which were resolved in the Settlement Order). Thus, it is the Committee's position that any action to vacate the Settlement Order provisions relating to the Committee Fund would require unwinding of the series of interrelated settlements approved therein, including releases given, an action the Committee believes that is both legally impermissible and impractical.

**G.**     **Litigation**

    **a.**     **Suit Against Titan Global Holdings, Inc.**

On July 10, 2009, the Debtor and the Committee filed an adversary proceeding against Titan Global Holdings, Inc., David Marks, Bryan Chance and Scott Hensell for avoidance of fraudulent conveyances and/or preferential transfers, avoidance of unlawful distributions, damages for unlawful distributions, recovery of property and related relief. The suit seeks the recovery of approximately $5,000,000 in transfers from the Debtor to Titan from the period September 14, 2007 through February 1, 2009. Defendants Chance, Marks and Hensell are former directors of APPCO and are sued in both their official capacities as directors and their individual capacities for making unlawful distributions to Titan under Tennessee law. The complaint seeks to recover the unlawful distributions from the individual directors. The Debtor's claims against Defendant Chance were assigned to Florida Sunshine as part of the Florida Sunshine Purchase Agreement. Thus, the claims against Defendant Chance provide no benefit to the Estate.

Substantive settlement negotiations regarding this adversary proceeding are ongoing. The Debtor anticipates that a settlement will be shortly reached which will be of substantial benefit to the Estate.

    **b.**     **Preferential Transfer Claims.**

No preferential transfer actions have been commenced to date. The Debtor is in the process of preparing demand letters to creditor/defendants and anticipates commencing the

filing of suit within the next sixty (60) to ninety (90) days if it is unable to settle the preference claims short of filing suit.

**H.**     **Bar Date**

Under the local bankruptcy rules, a bar date of June 8, 2009, was set for all pre-petition claims other than those of government units, and a bar date of August 10, 2009 was set for government units (collectively the "Bar Date").  As the bar date for both of the above forms of claims has passed, APPCO is reviewing the Claims and determining available objections thereto.  The Court set a bar date of January 15, 2010 for the filing of Administrative Expense Claims and Claims under 11 U.S.C. § 503(b)(9).  The Debtor has reviewed and filed objections to these administrative expense claims and these disputes are pending.  (*See* Section III A.1, supra).

# PLAN OF LIQUIDATION

## ARTICLE I - INTRODUCTION

The Plan's primary objectives are to liquidate the assets of the Debtor in a fashion that maximizes recovery to all creditors. APPCO believes that holders of Allowed Claims will obtain a greater recovery from this estate through the Plan than if its assets were liquidated under Chapter 7 of the Bankruptcy Code.

The statements contained in the foregoing Disclosure Statement include summaries of the Plan's provisions and of those documents referred to therein. The statements contained in the foregoing Disclosure Statement do not purport to be precise or complete statements of all the Plan's terms and provisions nor those of the documents referred to herein, and reference is made to the Plan, and to those documents for the full and complete statements of these terms and provisions.

**The Plan controls the actual treatment of Claims against, and Interests in, APPCO in the reorganization and will, upon the Effective Date, bind all holders of Claims against, and Interests in, the Debtor and its Estate, and other parties-in-interest. The terms and provisions of the Plan are controlling for all purposes. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan, on the other hand, the terms of the Plan are controlling.**

## ARTICLE II - OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its interest holders. Another goal of Chapter 11 is to

promote equality of treatment for similarly situated creditors and similarly situated interest holders in the distribution of a debtor's assets. A debtor may also liquidate its assets pursuant to a reorganization plan under Chapter 11.

The commencement of a Chapter 11 case creates an estate that comprises all of a debtors' legal and equitable interest as of the filing date. The <u>Bankruptcy Code</u> provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

Consummating a plan of reorganization is the principal objective of a Chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of or equity holder in the debtor, whether or not that creditor or equity holder is impaired under or has exceptions, and other than as provided in the plan itself or the confirmation order. The confirmation order discharges the debtor from any debt that arose prior to the confirmation date and substitutes therefore the obligations specified in the confirmed plan. However, in this case, no discharge will be granted APPCO because the Plan is a liquidating plan of reorganization.

A Chapter 11 plan may specify that certain classes of claims or equity interests are either to be paid in full upon effectiveness of the plan or are to remain unchanged by the reorganization effectuated by the plan. These classes are referred to as "unimpaired" classes and, because of this favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in the unimpaired classes. A Chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any

classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

APPCO believes that the Plan provides the best and most prompt possible recoveries to holders of Claims. Under the Plan, Claims against, and Interests in, the Debtor are divided into different classes. Under the Bankruptcy Code, "claims" and "equity interest" are classified rather than "creditors" and "shareholders" because they may hold claims or equity interests in more than one class. If the Bankruptcy Court confirms the Plan and it is consummated, then on the Effective Date or as soon as practicable thereafter, APPCO will take the steps necessary to effectuate the Plan. The Classes of Claims against, and Interests in, APPCO created under the Plan, the treatment of those Classes under the Plan are described in Article VII below.

## ARTICLE III - DEFINITIONS

**3.01.** **"Administrative Claim"** means any claim, including but not limited to claims for compensation of professionals made pursuant to Section 330 of the Bankruptcy Code, entitled to be treated as a Priority Claim under § 507(a)(1) of the Bankruptcy Code.

**3.02.** **"Administrative Claim Creditor"** means a Creditor holding an Allowed Administrative Claim.

**3.03.** **"Allowed Administrative Claim"** means an Administrative Claim that is an Allowed Claim.

**3.04.** **"Allowed Claim"** means any Claim in the amount and classification set forth in a proof of claim filed with the Court or in the Debtors' schedules of liabilities as not disputed, liquidated or contingent or to which no objection to allowance has been filed.

**3.05.** **"APPCO"** means Appalachian Oil Company, Inc., the Debtor.

**3.06** **"Bankruptcy Code"** means 11 U.S.C. § 101, et seq. and any amendments thereto.

**3.07.** **"Bankruptcy Rules"** means The United States Bankruptcy Rules.

**3.08.** **"Case"** means the Chapter 11 bankruptcy reorganization case of the Debtor designated as Case No. 09-50259.

**3.09.** **" Claim"** means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal equitable, secured or unsecured, as defined in § 105(a) of the Bankruptcy Code.

**3.10.** **"Class"** means the grouping of substantially similar Claims against the Debtor or the Estate.

**3.11.** **"Committee Fund"** means the monies held by Committee Counsel pursuant to the Settlement Order.

**3.12.** **"Confirmation"** means the entry of an order by the Court confirming the Plan at or after hearing pursuant to Section 1129 of the Bankruptcy Code.

**3.13.** **"Confirmation Date"** means the date of entry of an order of the Court confirming the Plan.

**3.14.** **"Consummation"** means completion of all distributions to be made under the Plan.

**3.15.** **"Court"** shall mean United States Bankruptcy Court for the Eastern District of Tennessee, Greeneville Division.

**3.16.** **"Creditor"** means all entities with Claims against the Debtor or the Estate.

**3.17.** **"CRO"** means P. A. Weber, III, Chief Restructuring Officer of the Debtor.

**3.18.** **"Debt"** means liability on a Claim.

**3.19.** **"Debtor"** means Appalachian Oil Company, Inc.

**3.20.** **"Disclosure Statement"** means Debtor's Disclosure Statement in its present form or as may be amended, modified or supplemented.

**3.21.** **"Effective Date"** means the date fixed for the Plan to be effective following the Confirmation Date.

**3.22.** **"Estate"** means the bankruptcy estate created upon commencement of the Case pursuant to Section 541(a) of the <u>Bankruptcy Code</u>.

**3.23.** **"Final Order"** means the Final Order Authorizing Debtor in Possession Financing and Use of Cash Collateral. [Document No. 242].

**3.24.** **"Greystone"** means Greystone Business Credit II, L.L.C.

**3.25.** **"Impaired"** shall have the same meaning as provided in Section 1124 of the <u>Bankruptcy Code</u>.

**3.26.** **"Interest Holder"** means the holder of equity interests or membership units in the Debtor.

**3.27.** **"Interests"** means the equity interests or membership units in the Debtor.

**3.28.** **"Petition Date"** means February 9, 2009.

**3.29.** **"Plan"** means the Plan of Liquidation submitted by the Debtor in its present form or as may be further amended, modified or supplement.

**3.30.** **"Priority Claim"** means any Claim entitled to priority treatment pursuant to Section 507 of the <u>Bankruptcy Code</u>.

**3.31.** **"Priority Creditor"** means a Creditor holding a Priority Claim.

**3.32.** **"Settlement Order"** means the Order Approving Compromise and Settlement By and Among Debtors, Official Committee of Unsecured Creditors, Greystone Business Credit II, L.L.C., Former Shareholders and Landlords filed June 10, 2009 [Document No. 461].

**3.33.** **"Superpriority Claim"** means the superpriority claim granted to Greystone in the Final Order.

**3.34.** **"Titan"** means Titan Global Holdings, Inc., the parent company of the Debtor.

**3.35.** **"Unsecured Claim"** means a Claim that is not secured by a lien on property of the Debtor or property of the Estate.

**3.36.** **"Unsecured Creditor"** means a Creditor holding an Unsecured Claim.

## ARTICLE IV - CONSTRUCTION

**4.01.**   Where not inconsistent or in conflict with the provisions of the Plan, the words and phrases used in the Plan shall have the meanings provided in the <u>Bankruptcy Code</u> or the <u>Bankruptcy Rules</u>.

**4.02.**   Section captions are for convenience only, and shall not affect the construction of the Plan.

**4.03.**   The first letters of terms defined in the Plan are capitalized.

## ARTICLE V - CLASSIFICATION OF CLAIMS AND INTERESTS

The Claims of creditors are divided into the following classes:

<u>**Class 1**</u>**:**          Administrative Claims.

<u>**Class 2**</u>**:**          Priority Claims.

<u>**Class 3**</u>**:**          Unsecured Claims.

<u>**Class 4**</u>**:**          Interest Holders.

<u>**Class 5**</u>**:**          Executory Contracts.

## ARTICLE VI - MEANS FOR EXECUTION OF THE PLAN

This Plan consists of a liquidating plan that proposes to complete the liquidation of the assets of the Debtor and distribute the proceeds thereof in accordance with the Plan.

## ARTICLE VII - TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

The Claims of Administrative Claim Creditors, Priority Creditors, Unsecured Creditors, and Interest Holders are Impaired under the Plan.

### 7.01. **Class 1 - Administrative Claims**

The holders of Allowed Administrative Claims entitled to priority under Section 501(a)(1) of the Bankruptcy Code, entities entitled to payment under Section 546(c) of the Bankruptcy Code or 553 of the Bankruptcy Code, and entities entitled to payment of administrative expenses pursuant to Sections 503 and 507(a) of the Bankruptcy Code shall receive on account of such Allowed Claims or administrative expense cash in the amount of such Allowed Claim or administrative expense on or before the Effective Date of the Plan or as soon thereafter as practicable. Notwithstanding the foregoing, professionals employed at the expense of the Estate pursuant to Section 503(b)(2) - (6) of the Bankruptcy Code shall receive cash in the amount awarded to such professionals and entities as soon thereafter as practicable after an order is entered by the Court approving such award pursuant to Section 330 or 503(b)(2) - (6) of the Bankruptcy Code, unless any such professional or other entity consents prior to confirmation to the treatment.

The Debtor estimates Total Allowed Administrative Expense Claims of $250,000 to $300,000. The Debtor anticipates generating sufficient funds from preference recoveries to pay Allowed Administrative Claims in full. The Allowed Administrative Expense Claims will be paid in full as allowed or once the Debtor has collected sufficient funds to pay such Allowed Administrative Expense Claims. However, if this does not occur, and the Estate is administratively insolvent, then the proceeds available will be distributed to holders of Allowed Administrative Expense Claims on a pro-rata basis. Holders of Administrative Expense Claims are treated as Impaired under the Plan.

### 7.02. **Class 2 - Priority Claims**

The priority claimants consist primarily of present and former employees of the Debtor asserting claims for benefits and PTO (personal time off). Under 11 U.S.C. § 507(a)(4), claimants asserting Claims for wages or other employee benefits are limited to a priority claim of

$10,950 earned within one hundred eighty (180) days of the Petition Date. If the amount of the Claim exceeds $10,950 or occurs more than 180 days prior to the Petition Date, then it is treated as an Unsecured Claim. There are other priority claimants arising from wage claimants, pre-petition property taxes, business taxes and other tax claims. The Debtor estimates total Priority Claims of $250,000.

The Debtor anticipates generating sufficient funds from preference recoveries to pay Priority Claims in full. However, if the Estate is administratively insolvent, then priority claimants will receive nothing on their Claims. If the Estate is not administratively insolvent, but the monies collected from preference recoveries are insufficient to pay the Priority Claims in full, then the Priority Claims will be paid on a pro-rata basis.

The holders of Priority Claims are Impaired under the Plan.

### 7.03. Class 3 - Unsecured Claims

The proceeds derived from the liquidation of the Debtor's assets, after the payment of Administrative Claims and Priority Claims, will be distributed to Unsecured Creditors holding Allowed Claims on a pro-rata basis. The source of payment for Unsecured Creditors is the Committee Fund and the proceeds from preference recoveries. APPCO estimates the amount of Unsecured Claims to be between $30,000,000 and $35,000,000..

APPCO is unable to provide a specific estimated time period at which time any distributions to Unsecured Creditors will be made. The Debtor is unable to project a dividend at this time outside the proceeds of the Committee Fund. Currently, the proceeds of the Committee Fund are directly allocated to the Claims of Unsecured Creditors. Assuming $30 million in Claims and $600,000 in the Committee Fund, the dividend to Unsecured Creditors would be two percent (2%). No distribution from the Committee Fund will be made until a determination is made with respect to the Debtor's ability to pay Administrative Claims and

Priority Claims and all objections to Claims are resolved. Once those determinations are made, a one-time distribution will be made to Unsecured Creditors.

Unsecured Creditors are Impaired under the Plan.

### 7.04. Class 4 - Interest Holder

The holder of the membership units in the Debtor is Titan. Upon completion of the liquidation process under the Plan and the final distribution to Creditors, APPCO will be dissolved under State law. Titan will retain no interest in the Debtor.

The Interest Holder is Impaired under the Plan.

### 7.05. Class 5 - Executory Contracts

All executory contracts or unexpired leases to which the Debtor is a party, that have not been previously rejected or assumed and assigned, will be deemed terminated and then rejected or rejected as of the Effective Date of the Plan, except for the Management Agreement to the extent that it has not been terminated as of the Effective Date.

## ARTICLE VIII - EFFECTIVE DATE

The Effective Date under the Plan will be thirty (30) days from the date of filing of the Confirmation Order by the Court.

## ARTICLE IX - MODIFICATION OF PLAN

The Plan may be modified upon motion of the Debtor prior to the Effective Date, without notice and a hearing and without additional disclosure pursuant to Section 1125 of the Bankruptcy Code provided that, after notice to the United States Trustee, and all parties who have filed and served a request for special notice in the Bankruptcy Case, the Court

finds that such modification does not materially or adversely affect any Creditor or any Class of Creditors.

At any time prior to Consummation, the Debtor may seek Court authorization to remedy any defect or omission, reconcile any inconsistencies in the Plan or in the order confirming the Plan or effect such other changes, modifications, or amendments as may be necessary to carry out the purposes and intent of the Plan.

## ARTICLE X - FINAL DECREE

The Debtor will make application for a final decree pursuant to Bankruptcy Rule 3022 upon the occurrence of the following:

1. The Confirmation has become final;

2. Payments under the Plan have commenced;

3. All U. S. Trustee's quarterly fees have been paid through the date of the final decree; and

4. Any adversary proceedings or contested matters have been concluded.

## ARTICLE XI - U. S. TRUSTEE'S FEES AND MONTHLY OPERATING REPORTS

All quarterly fees due the United States Trustee are to be paid until a final decree pursuant to Bankruptcy Rule 3022 has been entered by the Bankruptcy Court. Monthly operating reports will continue to be filed by the Debtor through the month of the entry of the final decree.

## ARTICLE XII - GENERAL PROVISIONS

### 12.01.  Jurisdiction

The Court will retain jurisdiction until Consummation of the Plan and an entry of a final decree closing the Bankruptcy Case.  The Court shall further retain jurisdiction under the Plan for all purposes consistent with the Plan and the Bankruptcy Code, which purposes include, but are not limited to:

**a.**　　The classification or allowance of a Claim of any Creditor and the reexamination of Claims which have been allowed for purposes of voting and the determination of such objections as may be filed against Creditors' Claims.

**b.**　　The determination of all questions and disputes regarding title to the assets of the Estate, and the determination of all causes of action, controversies, disputes or conflicts, including the right to participate in an distribution from the Estate, whether or not subject to an action pending as of the Effective Date, including, but not limited to, any right of the Reorganized Debtor to recover assets pursuant to the provisions of the Bankruptcy Code.

**c.**　　The correction of any defect, curing of any omission, or the reconciliation of any inconsistency in the Plan or in the order confirming the Plan, as may be necessary to carry out the purposes and intent of the Plan.

**d.**　　The determination of the allowability, validity and priority of Claims against the Debtor or the Estate, whether such Claims are asserted before or after the Effective Date.

**e.**　　The modification or amendment of the Plan after Confirmation pursuant to the Bankruptcy Rules or the Bankruptcy Code.

**f.**　　The enforcement and interpretation of the terms and provisions of the Plan.

**g.**　　The entry of an order or final decree concluding or terminating the Bankruptcy Case.

**h.**　　The granting of extensions of any deadlines set herein.

**i.**     The administration of the Bankruptcy Case, and implementation and Consummation of the Plan.

### 12.02.  Interpretation

To the extent that the terms of the Plan are inconsistent with the terms of any agreement or instrument concerning any Claim or Interest, or any other matter, the terms of the Plan shall control.

### 12.03.  Binding Effect

Upon Confirmation of the Plan, the Debtor and all Creditors and Interest Holders, whether or not the Claim of such Creditor is Impaired under the Plan and whether or not such Creditor or Interest Holder has accepted the Plan, shall be bound by the provisions of the Plan pursuant to Section 1141(a) of the Bankruptcy Code.

### 12.04.  Applicable Law

The Plan is to be governed by and construed under the Bankruptcy Code and the laws of the State of Tennessee, as they may be applicable.

### 12.05.  Implementation Orders

At any time, the Court may make such orders or give such direction as may be appropriate under Section 1142 of the Bankruptcy Code.


Respectfully submitted,

**HUNTER, SMITH & DAVIS**

By:     */s/Mark S. Dessauer*
           Mark S. Dessauer (TN BPR NO. 10421)
           Attorney for Debtor
           Post Office Box 3740
           Kingsport, Tennessee 37664
           (423) 378-8840; Fax: (423) 378-8801

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 8, 2010, the foregoing **Amended Disclosure Statement and Plan of Liquidation** was filed electronically.  The following parties will receive copies of the Disclosure Statement and Plan of Reorganization.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties, if any, have been served by hand delivery, overnight delivery, facsimile transmission, or by mailing a copy of same by United States Mail, postage prepaid.

Patricia Foster, Esq.
Attorney for the U. S. Trustee
800 Market Street, Suite 114, Howard Baker U. S. Courthouse
Knoxville, Tennessee  37902

Securities and Exchange Commission
100 F Street NE , Room 1070
Washington, DC  20549

John F. Carlton, Esq.
WHITEFORD, TAYLOR & PRESTON, LLP
7 St. Paul Street
Baltimore, Maryland 21202

All Parties Requesting Notice

**HUNTER, SMITH & DAVIS, LLP**

BY  */s/Mark S. Dessauer*
       Mark S. Dessauer

**DESSAUER: A-B: APPALACHIAN OIL**
**APPCO.85049**